OPINION.
Linda Norwell and V'Ann Ryther appeal from the trial court's order entering summary judgment against them in their action against the city of Cincinnati for federal civil-rights violations and related state-law torts. The claims of Norwell and Ryther arise from their arrests by Cincinnati police officers for alleged violations of city ordinances regulating sidewalk sales of goods and merchandise. In their single assignment of error, they contend that the trial court erred because genuine issues of material fact preclude summary judgment under Civ.R. 56(C). We find this assignment well taken with respect to their federal claims against the city under Section 1983, Title 42, U.S. Code, and with respect to some, but not all, of their state-law tort claims against the city. Therefore, we reverse in part and affirm in part.
 I.
Norwell and Ryther are self-described ticket brokers who were arrested on four separate occasions by members of the Cincinnati police "scalping detail" for selling Cincinnati Reds tickets on sidewalks and streets. In addition to making the arrests and issuing citations, police officers seized unsold tickets from both Norwell and Ryther. Three of the charges resulted in acquittal in the Hamilton County Municipal Court; the fourth was dismissed first for want of prosecution and then, upon remand from this court, at the request of the prosecutor.
The two women subsequently filed a civil suit in which they sought only money damages from the city of Cincinnati and the various arresting officers. The arresting officers were sued in their "official capacity as * * * law enforcement officer(s) of the City of Cincinnati." Along with alleged violations of federal civil-rights statutes, the complaint set forth state-law claims for false arrest, false imprisonment, malicious prosecution, tortious interference with business relations, and conversion. The gist of the allegations was that the city, through its police, embarked on a crusade to eliminate the practice of ticket scalping, and to put Norwell and Ryther out of business, by enforcing an anti-scalping policy when there was no law making such activity illegal.
The trial court originally granted summary judgment against Norwell and Ryther on all counts of their complaint. This court reversed that decision in Norwell v. Cincinnati (May 28, 1997), Hamilton App. No. C-960500, unreported, because certain depositions remained under seal. Upon remand, the trial court, after examination of the entire record, again granted summary judgment in favor of the city and the individual police officers. For the reasons that follow, we reverse in part.
 II.
The history of the city's anti-scalping policy is necessary to determine the lawfulness of Norwell and Ryther's conduct on the dates they were arrested. Although previous ordinances made the act of reselling tickets at greater than face value itself illegal, the last version of the ordinance, which required an excessive license fee, was declared unconstitutional by the court of common pleas, and was not replaced or reenacted. Consequently, at the time of Norwell and Ryther's arrests, ticket scalping at greater than face value was not — as it still is not — illegal in the city of Cincinnati.
There does remain, however, as the city acknowledges, a police "scalping detail." According to the city, the "scalping detail," despite its name, is "not assembled to address the sale of tickets for greater than face value." Rather, as described by the city in its brief, "[a] scalping detail is a temporary assignment [that] enforces Cincinnati's Municipal Code during special events like the opening day of the Cincinnati Reds' baseball season." The purpose of the "scalping detail," according to the city, is to enforce traffic laws and city ordinances regulating the sale of goods, merchandise, food, drink, and other commodities during special events.
Chapter 839 of the Cincinnati Municipal Code contains the city ordinances regulating these sales and applies to two types of sellers referred to as either "itinerant vendors" or "peddlers." Cincinnati Municipal Code 839-1-I and 839-1-P. The code defines the two types of sellers as follows:
 "Itinerant vendor" shall mean and include any person, firm or corporation, except peddlers on the street from vehicles or door-to-door, who engages in or conducts, either as principal or agent, in the city of Cincinnati, a temporary or transient business buying or selling goods, wares, merchandise, food, confectionery or drink with the intention of continuing such business in any one place for a period of not more than 120 days.
Cincinnati Municipal Code 839-1-I.
 "Peddler" shall mean and include any person who goes from city-to-city, or from place to place, or from door-to-door, selling or offering to sell or barter, or carrying for sale or barter, or exposing therefore, any goods, wares, merchandise, food, confectionery, drink, or other commodity, carried by hand, from portable stands or tables, or by manually propelled vehicles, or by motor- or animal-drawn vehicles.
Cincinnati Municipal Code 839-1-P.
Specifically excluded from the definitional activities of an "itinerant vendor" or "peddler" is the "sale of tickets to entertainment/sporting type events at face value or less." Cincinnati Municipal Code 839-5. The only limitation imposed by Chapter 839 on the sale of tickets at face value or less is that they not be displayed or sold to the occupants of vehicles stopped in traffic, or in a manner that "blocks, obstructs or restricts the free passage of pedestrians or vehicles in the lawful use of the sidewalks or highways or ingress or egress to the abutting property." Id.
The city's position is that a person reselling tickets on the street at face value or above fits the definition of a "peddler" and therefore must be licensed[1] and must comply with the requirements of Cincinnati Municipal Code 839-11. That section imposes on licensed peddlers selling "goods, wares, merchandise, food, confection or drink" limitations on the manner and location in which they may operate. Among them is the requirement that licensed peddlers not display or sell their goods within twenty feet of an intersection or on a sidewalk that is narrower than twelve feet in width. Cincinnati Municipal Code 839-11(d) and (e). It is under the authority of these provisions, the city argues, that the police properly arrested either Norwell or Ryther or both on each of the four occasions summarized below.
 III.
The claims against the city and its officers stem from the following four separate incidents resulting in the arrest of either Norwell or Ryther or both by the named officers, all of whom were members of the police "scalping detail." Although the facts of each incident are extremely important and must be considered in their entirety, they are too lengthy to describe in detail here. We therefore summarize only the primary factual disputes.
A. April 6, 1992
The first incident occurred on April 6, 1992, which was the opening day of the baseball season for the Cincinnati Reds. Before the game, Norwell, the owner of a business called "Ticket Connection," and Ryther, her employee, were in the downtown area. Norwell stated that she carried approximately one hundred and fifty tickets to the game in a "pouch/purse."
Officers Luken and Haun, operating in plainclothes, approached the two women on the corner of Hammond and Sycamore. Both Norwell and Ryther denied that either was selling, displaying, or advertising tickets at the time that they were stopped. Norwell stated that Officer Luken asked if she had any tickets to sell, to which she replied, having recognized the two men as police, "I don't have any tickets for police officers." Both women claimed at that point they were placed under arrest, thoroughly searched, and deprived of their entire inventory of tickets by the two officers.
The case went to trial on December 23, 1992. According to Officer Luken's testimony, the arrests were precipitated when he saw a group of approximately six to eight people congregated around Norwell and Ryther. According to him, both women were displaying tickets and engaging in discussions concerning prices above face value. He testified that he interrupted the discussion to ask for four tickets in the blue seating section and was directed toward Ryther, who asked him several times if he was a police officer. Each inquiry met with a denial. When Ryther finally quoted him a price, Luken testified, he arrested the two women and cited them for "selling tickets in excess of face value, and on [a] sidewalk less than 12 feet wide." Officer Holloway's testimony corroborated that of his partner.
Following the presentation of the evidence, the trial judge found both Norwell and Ryther not guilty without giving any explanation for his decision.
B. June 29, 1993
The second incident occurred on June 29, 1993, and involved Norwell and Ryther and Officers Prem, Priestle, and Holloway. Officer Prem testified that, while patrolling in a vehicle on "scalping detail" with Officers Priestle and Holloway, in plainclothes, he observed Ryther in the marked crosswalk on the corner of Third and Sycamore. According to Officer Prem, Ryther was stopping people in the crosswalk while holding tickets and bearing a sign. Ryther, however, testified that she was not standing in the crosswalk, but was on the sidewalk, at least twenty-five feet from the corner and the nearest crosswalk.
Officer Prem testified that he stopped his vehicle, and that Officer Priestle approached Ryther and confirmed that she was in violation of Cincinnati Municipal Code 839-11(e), which prohibits the sale of goods or merchandise within twenty feet of a crosswalk. According to Ryther, Officer Prem appeared behind her, grabbed her sign, and then refused to tell her why she was being arrested until he had finished writing a citation. Officer Prem confiscated the sign, two parking passes, and seventeen baseball tickets.
Officer Prem and Officer Holloway next approached Norwell, who was standing in the middle of the block on Sycamore, allegedly in front of a crosswalk. At the time of their approach, Officer Prem testified, Ryther had begun yelling to Norwell, informing her that Prem and Holloway were police officers. Officer Prem testified that Norwell then ran into the restroom of a parking garage, and that he and Officer Holloway followed her, finally getting her to come out.
Norwell testified that she was in the Atrium II building and went into a restroom. She stated that, after coming to the door, Officer Holloway ordered her to come out immediately. When she did so, she testified, Officers Prem and Holloway told her that she was under arrest. She asked why she was being arrested since she had told them she had not offered to sell either officer a ticket. She said that they advised her that she had allegedly offered a ticket or tickets to "someone else" and that she needed to go to court to find out any further information. She testified that Officer Prem also searched her pouch/purse, removing and seizing the tickets therein.
The cases against Ryther and Norwell stemming from the June 29, 1993, incidents were consolidated with a case involving another defendant and were made the subject of a motion to dismiss. In the motion, Norwell and Ryther argued that tickets were not merchandise and therefore that their sale was not subject to Cincinnati Municipal Code 839-11(e). This argument was rejected by the municipal court judge. Cincinnati v.Hawkins (1993), 67 Ohio Misc.2d 4, 643 N.E.2d 1184 (Painter, J.). The cases, however, were later dismissed for want of prosecution. The state appealed and we reversed the dismissals.State v. Norwell (Oct. 14, 1994), Hamilton App. Nos. C-940069 and C-940071, unreported. On remand, the cases were dismissed once again, this time at the request of the prosecutor.
C. August 13, 1993
Officer Duane Reynolds testified by deposition that he was in plainclothes walking north on Sycamore Street when he saw Norwell in the street on the corner of Hammond. While he was in the street, according to Officer Reynolds, Norwell asked him if he wanted to buy Reds tickets. He purchased four tickets with a face value of $11.50 for $30 each. She took the money, stuck it in a "fanny pack," and continued walking across the street, at which point he identified himself. He confiscated 42 Reds tickets and $741 cash from her and cited her for selling tickets in excess of face value within twenty feet of a crosswalk. He said that the tickets were eventually destroyed and that the money was returned to Norwell on June 25, 1994.
In her deposition, Norwell admitted selling Reds tickets on Third Street at the Atrium II building that day, but adamantly denied selling tickets in the middle of the street. She said that she passed Officer Reynolds in the intersection on her way to the restroom. According to Norwell, Officer Reynolds stopped her, identified himself as a police officer and announced that she was under arrest for a violation of Cincinnati Municipal Code 839. She testified that, despite her objection, Officer Reynolds seized her pouch/purse and confiscated her money and tickets.
The case went to trial on May 27, 1994. At the close of the state's case, counsel for Norwell moved for an acquittal under Crim.R. 29, arguing that Cincinnati Municipal Code 839-11(e) only applied to the sale of tickets at face value or above, and that the state had failed to introduce any evidence of the face value of the tickets. In granting the Crim.R. 29 motion, the trial court stated that it was "conceivable there is some kind of high roller ticket that may have cost 30 bucks depending on where you are."
D. April 4, 1994
Officer Haun testified in his deposition that on this date, which was once again the Reds' Opening Day, he saw Ryther standing with tickets in her hand and talking to the driver of a stopped vehicle at the corner of Third and Sycamore. The driver then turned the corner, stopped, exited from his vehicle, and walked to where she was standing on the corner. Officer Haun said that he then walked over and heard the two discussing the sale of Reds tickets. Officer Haun cited Ryther for selling tickets at greater than face value within twenty feet of an intersection in violation of Cincinnati Municipal Code 839-11(e).
According to Ryther, at the time of her arrest she was standing with a computer printout of the tickets she had available for the game. The tickets were in a box in the trunk of Norwell's car parked next to her. A sign was leaning against a post advertising that tickets were available. She stated that she had just completed a sale and was closing the trunk of the car at a distance "much more than twenty feet from the intersection," when Officer Haun pulled up in a car, jumped out, and informed her that she was under arrest. She stated that Officer Haun then told her that he wanted the tickets, and that, after she refused, he gave her a simple ultimatum: give him the keys to the car or have it towed. She stated that she felt helpless and fearful of damage to the car. She said that, to her disbelief, Officer Haun then "took" the keys out her hand and opened the trunk, confiscating the entire inventory of tickets.
According to Ryther, she then said to Officer Haun, "I said, you're not taking my tickets. I said, all you need is two tickets for this." Officer Haun, she testified, responded by saying, "[N]o, I'm putting you out of business," and refused to give her a receipt for the tickets. She stated that he then told her that she could go to the district station with him if she was concerned about the tickets. She said that she reluctantly agreed, asking Officer Haun why he was doing this to her. She stated that he responded by blaming his superior and saying that "if his boss was going to make him miserable, he was going to make somebody miserable, and that just happened to be [her]." She also testified, "And * * * on the ride over to the district, he [Officer Haun] was saying stuff about — I said, what's it going to take to get you to get off my back. And he said, well, when Miss when Marge Schott quits putting pressure on the City and his boss quits putting pressure on him, he'll leave me alone."
The case went to trial and was dismissed on a Crim.R. 29 motion for acquittal. The record does not demonstrate the trial court's reasons for its ruling.
 IV.
Before beginning our analysis of the issues raised in the assignments of error, an important point must be made regarding the way in which this case was pleaded. As we have noted, in addition to the city, the complaint named as defendants the arresting officers in their "official capacity" as Cincinnati police officers. The officers were not sued in their individual or personal capacity. The distinction is more than semantic. As the United States Supreme Court has observed in the context of Section 1983 claims:
 Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. See, e.g., Schuer v. Rhodes, 416 U.S. 232, 237-238, 94S.Ct. 1683, 1886-1687, 40 L.Ed.2d 90 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. Brandon [v. Holt, (1985)], 469 U.S., at 471-472, 105 S.Ct., at 878. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.
 Kentucky v. Graham (1986), 473 U.S. 159, 165-166, 105 S.Ct. 3099, 3105.
Admittedly, the distinction between official- and personal-capacity suits has primary significance in civil-rights claims against state officials, since suits against the state itself are barred jurisdictionally by the Eleventh Amendment.Will v. Michigan Dept. of State Police (1989),491 U.S. 58, 109 S.Ct.2304. Consequently, federal courts have interpreted Fed.R.Civ.P. 9(a)[2] as requiring plaintiffs seeking damages from state officials under Section 1983 to "set forth clearly in their pleading that they are suing the state defendant in their individual capacity for damages." Wells v.Brown (C.A.6, 1989), 891 F.2d 591, 592.
Because this suit involves a municipality rather than the state, the jurisdictional bar of the Eleventh Amendment is not at issue. Will, supra, at 70, 109 S.Ct. at 2312. That is not to say, however, that the capacity in which municipal officials are sued can be simply overlooked. As the Sixth Circuit Court of Appeals observed in Wells, "[I]t is not too much to ask that if a person or entity is to be subject to suit, the person or entity should be properly named and clearly notified of the potential for payment of damages individually."Wells, supra, at 593. Additionally, there are important analytic differences between official- and personal-capacity suits regarding both the degree of proof and the availability of immunity defenses (e.g., qualified immunity).
In the federal system, there is support for the view that, when the complaint fails to state in what capacity the governmental actors are being sued, then the entire course of proceedings should be examined, such as motions for summary judgment and the responses thereto, to determine the true nature of the suit. See Rahman v. Michigan Dept.of Corrections (C.A.6, 1995), 65 F.3d 489. The Sixth Circuit Court of Appeals generally holds, however, that, absent any indication to the contrary, ambiguity is resolved in favor of an official-capacity suit. See Whittington v. Milby
(C.A.6, 1991), 928 F.2d 188, 193, certiorari denied (1991),502 U.S. 883, 112 S.Ct. 236.
In the case sub judice, not only is the complaint neither silent nor ambiguous with respect to the capacity in which the individual officers are sued, but it expressly states that they are being sued in their official capacity. On the face of the complaint, there is no averment that can possibly be interpreted as one indicating a personal-capacity action.
Concededly, Ohio's Civ.R. 9(A), like its federal counterpart, provides that, unless it is necessary to show the court's jurisdiction, the capacity in which a party is being sued need not be averred. Where, as here, however, the plaintiff elects to state the capacity in which the individually named defendants are being sued by expressly averring that they are being sued in their official capacity, the better rule, in our view, is one that holds the plaintiff to the pleadings.[3] Accord AsherInvestments, Inc. v. Cincinnati (1997), 122 Ohio App.3d 126,129, 701 N.E.2d 400, 402.
In sum, because this action was specifically pleaded as one against the city and the individual officers in their official capacity, we hold that the only real party in interest is the city. Our analysis of the issues that follow, therefore, examines only municipal liability.
 V.
In their single assignment of error, Norwell and Ryther assert that the trial court erred by granting summary judgment to the city on each of the counts contained in their complaint. This assignment requires that we examine each count to determine whether the city, as the party moving for summary judgment, successfully demonstrated that there existed no genuine issues of material fact, and that the city was entitled to judgment as a matter of law. Civ.R. 56.
A. The Federal Civil-Rights Claims
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
Section 1983, Title 42, U.S.Code.
 A Section 1983 claim requires proof of two elements: (1) that the conduct complained of be committed under color of state law, and (2) that the conduct deprive the claimant of rights, privileges, or immunities secured by the Constitution or laws of the United States. St. Clair Corp. v. Cleveland
(1990), 49 Ohio St.3d 33, 34, 550 N.E.2d 456, 459, citing Paratt v. Taylor (1981), 451 U.S. 527, 535, 101 S.Ct. 1908, 1912-1913.
Although the Court in Monroe v. Pape (1961),365 U.S. 167, 81 S.Ct. 473, excluded municipalities from the term "person" in Section 1983, that exclusion was narrowed in Monell v. Departmentof Social Services (1978), 436 U.S. 658, 98 S.Ct. 2018. A municipality may be sued for monetary, declaratory, or injunctive relief[4] under Section 1983 where the action that is alleged to be unconstitutional either (1) implements or executes a policy, ordinance, regulation, or decision officially adopted and promulgated by the municipality, or (2) results from governmental "custom or usage" that has become so settled as to have the force of law. Id. at 690-691,98 S.Ct. at 2035-2036.
In Pembaur v. Cincinnati (1986), 475 U.S. 469, 483,106 S.Ct. 1292, 1299-1300, the Court described the term "policy" as one referring to "formal rules or understandings — often but not always committed to writing — that are intended to, and do, establish fixed plans of action to be followed under similar circumstances." Id. at 483, 106 S.Ct. at 1299. While "policy" generally connotes a rule of general application, a decision "tailored to a particular situation" may also constitute a "policy" if made by the proper municipal decision-maker. Id. Finally, the Court has made clear that the identification of policymaking officials is a question of state law requiring the examination of local ordinances and regulations to determine the official or body that has the responsibility for making law or setting policy in any given area.City of St. Louis v. Praprotnik (1987), 485 U.S. 112,126, 108 S.Ct. 915, 925. The Court has acknowledged, however, that state law will not "always speak with perfect clarity" on the subject. Id. It has recognized that the authority to make municipal policy may be granted directly by legislative enactment or delegated by the person possessing such authority.Pembaur, supra, at 483, 106 S.Ct. at 1300.
In sum, for a municipality to be liable under Section 1983, several factors must be present: (1) the municipality must itself be responsible by either sanctioning or ordering the claimed constitutional violation; (2) the municipal actors must have "final" policymaking authority under state or municipal law (or have been delegated such) for that particular area of the city's business; and (3) the action taken must be pursuant to some policy adopted by the municipal actors exercising their policymaking authority.
Norwell and Ryther have not identified any particular municipal official, other than the arresting officers, as the decision-maker responsible for instigating their arrests. That is not to say, however, that the record is devoid of any evidence from which a reasonable person could infer that a decision was made at a higher, policymaking level to put them out of business despite the legality of their enterprise. The city maintains what it chooses to call a "scalping detail," strongly suggesting a municipal animus against a practice that is not, by itself, illegal. Under municipal law, the chief of police, subject to the approval of the safety director, "shall have control of the assignment and stationing of the members of the police force and direction of the police work of the city." Cincinnati Administrative Code Section 4. Thus an inference may be drawn that implementation of the "scalping detail" originated with the chief of police with the approval of the safety director.
There are, furthermore, statements of record attributed to the arresting officers by Norwell and Ryther that provide a basis to infer a larger purpose behind these arrests. As for the probative value of these statements, it should be noted that Civ.R. 56(E) requires that assertions be made "on personal knowledge" and that the facts set forth be such that "would be admissible in evidence." Although these statements appear to be inadmissible hearsay, under Evid.R. 801(D) (2), because the arresting officers were agents of the city, they are not considered as such. These statements, mostly attributed to Officers Haun and Luken, expressed a desire not simply to punish the women for violations, but to "put them out of business" and "make an example" of them. Most telling, there is also the statement, attributed to Officer Haun by Ryther, that the work of the "scalping detail" was in response to Marge Schott, then majority owner of the Reds, putting pressure on the city. Presumably such pressure was not to see that traffic laws and city ordinances were enforced, but that ticket scalping was stopped.
We emphasize that these statements are only the version of events told by Norwell and Ryther. However, for the purposes of summary judgment, their version cannot be discredited. Civ.R. 56(C). Rather, they are entitled to have all reasonable factual inferences drawn in their favor. This being so, in determining the propriety of summary judgment, the trial court must have accepted their version of the arrests in which they claimed that they were doing nothing to contravene Cincinnati Municipal Code Chapter 839 — in other words, that there was no probable cause for these arrests.
Admittedly, this conclusion may have been unsupportable, both from an evidentiary and a reasonableness standpoint, had any of the arrests resulted in a conviction. However, none did. Each arrest, furthermore, was occasioned by the warrantless seizure of the entire cache of tickets possessed by the two women, resulting in a substantial loss of potential revenue.[5]
Unlike other nonperishable inventory such as souvenir T-shirts or sunglasses, the tickets lost their value once seized. The insistence, as described by Norwell and Ryther, with which the arresting officers seized all the tickets, in conjunction with the statements attributed to them of putting the women "out of business" and making "an example" of them, create further a basis to infer an ulterior motive for the arrests.
It should be pointed out that Norwell and Ryther also make the argument that the city is liable under Section 1983 because of a failure to adequately train the arresting officers on the substantive provisions of Chapter 839. While the inadequacy of police training may form the basis of a 1983 action, the failure to train must amount to "deliberate indifference to the rights of persons with whom the police come into contact." City ofCanton v. Harris (1990), 489 U.S. 378, 388, 109 S.Ct. 1197,1204. Furthermore, it is only when this "deliberate indifference" rises to the level of a city policy or custom that it becomes actionable under Section 1983. Id. at 390,109 S.Ct. at 1205. Such willful disregard may be inferred, but such inference is justified only when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id.
Here, although there is evidence that the officers may have thought that selling tickets at over face value was itself an offense[6], there is no evidence from which one could reasonably infer that this confusion over the ordinance was the result of "such inadequate training [that] can justifiably be said to represent `city policy.'" Id. It has been previously noted that the ordinance is not a model of clarity. See Cincinnati v. Hawkins, supra, 67 Ohio Misc.2d 4
at 9, 643 N.E.2d at 1187-1188. Poor statutory drafting is arguably the rule rather than the exception, however. Though unnecessarily prolix, the ordinance is not so difficult to understand that the city's failure to offer special training on its meaning can be construed as a policy of indifference to its proper enforcement.
We hold, therefore, that there are triable issues of material fact under the Section 1983 claim only with respect to the particular allegation that the city engaged in an anti-scalping policy that caused Norwell and Ryther to be unlawfully arrested and their property to be improperly seized.
B. The State-Law Torts
In addition to the alleged violation of their civil rights under federal law, Norwell and Ryther set forth state-law claims of false arrest, false imprisonment, and malicious prosecution for the arrests occurring on April 4, 1994, August 13, 1993, and June 29, 1993.[7] It should also be pointed out that, because this suit is only against the city, each of the alleged torts must have been committed in the officers' scope of employment in order to impose liability on the city under the doctrine of respondeatsuperior. This requirement has clearly been met, however, at least for the purposes of avoiding summary judgment, as each of the alleged torts ostensibly arose out of arrests made by the officers in the line of duty.
1. Malicious Prosecution
As this court has observed:
 The tort of malicious criminal prosecution provides redress for the harm to a plaintiff's dignity and reputation occasioned by the misuse of criminal proceedings. Criss v. Springfield Twp. (1990), 56 Ohio St.3d 82, 84, 564 N.E.2d 440, 443; Trussel v. Gen. Motors Corp. (1990), 53 Ohio St.3d 142, 144-145, 559 N.E.2d 732, 734-736. To sustain an action for malicious criminal prosecution, the plaintiff must plead and prove by a preponderance of the evidence (1) malice in the institution or continuation of the prosecution, (2) a lack of probable cause for undertaking the prosecution, and (3) the termination of the prosecution in favor of the accused. Trussel, supra, syllabus.
 Evans v. Smith (1994), 97 Ohio App.3d 59, 67-68, 646 N.E.2d 217, 222.
As for the third element, there is no question that the three prosecutions have terminated in favor of Norwell and Ryther.
We must determine, therefore, whether there were genuine issues of material fact on the first two elements: malice and lack of probable cause.
"Malice," as the term is used in a claim of malicious prosecution, refers to "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice."Criss, supra, at 85, 564 N.E.2d at 443. The absence of probable cause may give rise to an inference of malice.Melanowski v. Judy (1921), 102 Ohio St. 153,131 N.E. 360, paragraph one of the syllabus; Garza v. ClarionHotel, Inc. (1997), 119 Ohio App.3d 478, 695 N.E.2d 811. As this court has stated, the lack of probable cause is the gist of the tort. Garza, supra, at 482,695 N.E.2d at 813. Probable cause may be present though no crime has actually been committed; it exists when the facts and circumstances are such that a cautious individual would be warranted in the belief that the person accused is guilty of the offense with which he or she is charged. McFinley v.Bethesda Oak Hosp. (1992), 79 Ohio App.3d 613, 617,607 N.E.2d 936, 939.
Initially, we reject the argument advanced by Norwell and Ryther that probable cause did not exist for these arrests as a matter of law because the geographical limitations of Cincinnati Municipal Code 839-11(d) and (e) apply only to "peddlers," and because, by definition, selling tickets at whatever price the market may bear does not make them peddlers. According to the two women, the "repeated reference" to tangible items in the definitional description of a peddler's wares "reinforces the historical differentiation between peddlers and ticket sellers, and make[s] it abundantly clear that a peddler, within the contemplation of Section 839-11, is not intended to include a ticket seller."
This same argument was advanced by Norwell and Ryther in the prosecution following their June 29, 1993, arrest. The argument was rejected by the trial judge in Hawkins,supra. Relying upon the definition of merchandise as it appeared in Black's Law Dictionary and the Oxford English Dictionary, the trial judge reasoned that ticket sales came under the term "merchandise" as that word is used in the phrase "goods, wares, and merchandise" to describe the stock and trade of a peddler in Cincinnati Municipal Code Chapter 839.Hawkins, supra, at 10, 643 N.E.2d at 1188. We agree.
Based upon the evidentiary material we have previously summarized and discussed under the first assignment of error, however, we hold that there were genuine issues of material fact on the issues of lack of probable cause and malice. Obviously the testimony of the police officers supports a finding of probable cause. The testimony of the plaintiffs, however, does not. As this court has previously noted, where resolution of issues of material fact depends upon whether the trier of fact believes the plaintiff or the defendant, "summary disposition of a malicious prosecution claim is inappropriate."Evans v. Smith (1994), 97 Ohio App.3d 59, 69,646 N.E.2d 217, 223.
2. False Arrest and False Imprisonment
False arrest and false imprisonment have been described as "closely akin" and yet fundamentally different from the tort of malicious prosecution. Rogers v. Barbera
(1960), 170 Ohio St. 241, 243-244, 164 N.E.2d 162, 164. A suit for false imprisonment or false arrest is the proper action "where the aggrieved party is arrested without legal process, or under a void process * * *." Id. at 243-244, 164 N.E.2d at 164. Between false imprisonment and false arrest there is also an important distinction: in a false arrest, false imprisonment also exists, but it is based upon some asserted legal authority to enforce the law (such as that possessed by a police officer), whereas the tort of false imprisonment is reserved for those situations in which detention is purely a matter between private persons. Evans, supra, at 70, 646 N.E.2d 224, citing Rogers at 243, 164 N.E.2d at 164.
Here, the pertinent tort is false arrest. We hold, however, that the tort was not properly asserted here because, as a matter of law, each of the arrests was executed through legal process. As the court noted in Rogers, a "`suit for false arrest * * * is the proper action where the aggrieved party is arrested without legal process, or under a void process; but where the process on which the arrest is made is regular on its face, but is sued out maliciously and without probable cause, the remedy is an action for malicious prosecution.'" Rogers,supra, at 243-244, 164 N.E.2d at 164, quoting 22 American Jurisprudence (1939) 353, False Imprisonment, at Sections 2 and 3. Even if the allegations of Norwell and Ryther are accepted as the truth, there is nothing in the record to suggest that the arrests were other than regular on their face.
3. Tortious Interference with Business Relations
The elements of tortious interference with business relations under Ohio law require that one intentionally and improperly interfere with the plaintiff's prospective contractual relations by either (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing the plaintiff from acquiring or continuing the prospective relation. Hoyt, Inc. v. Gordon Associates,Inc. (1995), 104 Ohio App.3d 598, 603, 662 N.E.2d citingWalter v. Murphy (1988), 61 Ohio St.3d 553,573 N.E.2d 678, and applying 4 Restatement of the Law 2d, Torts (1979) 20, Section 766B.
Several other points need be made: a showing of malice, such as ill will or spite or hatred, is not required. Hoyt,supra, at 604, 662 N.E.2d at 1091; Elwert v. PilotLife Ins. Co. (1991), 77 Ohio App.3d 529, 602 N.E.2d 1219;Reichman v. Drake (1951), 89 Ohio App. 222,100 N.E.2d 533; MPS Trimco, Inc. v. Lewis (Feb. 18, 1993), Cuyahoga App. No. 61829, unreported. Second, Ohio courts have relied on Section 767 of the Restatement of the Law 2d Torts for the factors to be considered in determining whether the interference is improper. These factors include (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests interfered with; (4) the interests sought to be advanced by the actor; (5) the societal interests in protecting the freedom of action and the contractual interests of the plaintiff; (6) the proximity or remoteness of the interference; and (7) the relations of the parties.
Also, of particular relevance here, Ohio courts have recognized, consistent with the Restatement, that one may be privileged to interfere with certain contractual or prospective contractual relations depending on the societal interest advanced. Hoyt, supra, at 605, 662 N.E.2d at 1092, citing Juhasz v. Quik Shops, Inc. (1977), 55 Ohio St.2d 51,379 N.E.2d 235.
Inarguably the arresting officers here interfered with Norwell and Ryther's prospective contractual relations with those willing to buy tickets. The question is whether they were legally entitled to do so. Obviously, if there was probable cause to make these arrests, the defense of privilege was established. As we have noted, however, whether probable cause existed depends upon whose testimony is believed, that of the arresting officers or that of Norwell and Ryther. When the trial court granted summary judgment on this claim, it precluded the trier of fact from resolving issues of fact necessary to make a fair determination.
4. Conversion
Finally, Norwell and Ryther have brought a claim for conversion of the tickets that were seized from them during these arrests. The tort of conversion in Ohio requires that the defendant have either wrongfully exercised dominion over property in exclusion of the right of the owner, or withheld the property from the owner's possession under a claim inconsistent with the owner's rights. Erkins v. CincinnatiMunicipal Police Department (Oct. 23, 1998), Hamilton App. No. C-970836, unreported.
Here, thousands of dollars worth of tickets were seized from Norwell and Ryther as a result of the arrests. Once seized, the tickets became worthless, having no resale value. According to Officer Luken, the purpose of confiscating the tickets was that they be "held collectively for the Court." The question is, however, upon what authority, if any, these tickets were subject to warrantless seizure.
Generally the police may seize without a warrant any property coming under the definition of "contraband." Contraband is normally thought of as property that is "in and of itself * * * unlawful for a person to acquire or possess." R.C.2901.01(M) (1). The statutory definition also includes, however, "[p]roperty that is forfeitable pursuant to a section of the Revised Code or by an ordinance, regulation, or resolution * * *." R.C. 2901.01(M) (4). This latter provision is the only arguable basis upon which one could conclude that the tickets constituted contraband since Cincinnati Municipal Code 839-99 provides that subsequent violations of Chapter 839 are to be treated as third-degree misdemeanors "including forfeiture of goods." Goods seized as contraband under R.C. 2901.01(M) (4) are not subject to replevin or any other action in any court, and, pending a hearing, are not subject to release to the owner. R.C.2933.43(B) (2).
The difficulty in characterizing the tickets as contraband under this logic is twofold: (1) without a conviction, there was no previous violation of the ordinance, and (2) there is no evidence of record that the procedures for forfeiture, including a petition, hearing, and order of forfeiture, were followed — in other words, it is clear that while the police may have referred to the tickets as "contraband," at least according to Norwell and Ryther, they did not treat them as such. It appears, rather, that the seized tickets simply fell into a black hole referred to as being "held collectively for the Court."
If the tickets were not contraband, then a proper basis for this warrantless seizure becomes even more problematic, even if we assume that there was probable cause for the arrests. As evidence, the tickets were not necessary for conviction and their evidentiary value would have been satisfied with one or two rather than with every single ticket that the two women had in their possession. One compelling aspect of Norwell and Ryther's version of events — consistent with their claim that the true purpose of these arrests was not to regulate their business but to put an end to it — is the zealousness with which the arresting officers searched for, found, and confiscated every single ticket that the two women possessed for resale.
C. Statutory Immunity
Ohio's Political Subdivision Tort Liability Act, R.C. Chapter 2744, specifically excludes from immunity acts committed by city employees "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A) (6).[8] Of pertinence here are the first two. This court has described "malice" in this statutory context as "the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." Cole, supra, at 5, citing Jackson v. Butler Cty. Bd. of Cty. Commrs. (1991),76 Ohio App.3d 448, 452, 602 N.E.2d 363; Bush v. Kelley'sInc. (1969), 18 Ohio St.2d 89, 247 N.E.2d 745. We have also described "bad faith" as conduct that involves "a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill-will partaking of the nature of fraud, or an actual intent to mislead or deceive another."Id., citing Slater v. Motorists Mut. Ins. Co. (1962), 174 Ohio St. 148, 187 N.E.2d 45, paragraph two of the syllabus.
Based upon our previous discussion of the evidence of record and the need to avoid weighing matters of credibility on summary judgment, we hold that there was sufficient evidence to create a question of fact whether the actions of the arresting officers were part of a concerted attempt to drive Norwell and Ryther out of business because of a municipal animus against ticket scalping, or whether they were part of an honest effort to enforce Cincinnati Municipal Code Chapter 839 that, for whatever reasons, failed to result in a single conviction. If the former, then there was both malicious purpose and bad faith, and sovereign immunity is not available under R.C. 2744.03(A) (6).
 VI.
In summary, Norwell and Ryther were arrested four times and never found guilty of anything, while having thousands of dollars of property — not contraband — seized from them. They have presented evidence in the form of their own testimony that the arresting officers acted with a purpose other than their lawful arrest, and that the city itself may have sought to eliminate their business due to a hostility toward the legal enterprise of ticket scalping. This testimony may later be rejected, in whole or in part, by the trier of fact, but it is sufficient to create genuine issues of material fact to withstand summary judgment under Civ.R. 56. Accordingly, the judgment of the trial court in favor of the city — with the exception of the summary judgment granted on the claims of false arrest and false imprisonment — is reversed, and this case is remanded for further proceedings consistent with this decision.
Judgment affirmed in part and reversed in part, and causeremanded.
 Doan, P.J., and Painter, J., concur.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Opinion.
[1] It should be pointed out that the issue of licensure is not involved in this case.
[2] Fed.R.Civ.P. 9(a) provides that it is "not necessary to aver the capacity of the party * * * to be sued * * * except to the extent required to show the jurisdiction of the court."
[3] Such a rule would, of course, not preclude a plaintiff from timely resorting to Civ.R.15 for the purpose of amending the complaint. We decline to speculate upon the appropriateness of such relief here if the plaintiffs had sought leave to amend from the trial court.
[4] Despite the availability of declaratory and injunctive relief under Section 1983, Norwell and Ryther have only sued for monetary damages.
[5] The propriety of the warrantless seizure of these tickets is more fully discussed infra in the part of this opinion that discusses the tort of conversion.
[6] Officer Haun, for example, in his deposition made clear his mistaken opinion that selling tickets at greater than face value was an offense in and of itself.
[7] The complaint omits these claims for the arrest and prosecution stemming from the April 6, 1992, incident.
[8] It should be pointed out that the Act specifically excludes from immunity claims based upon federal law and the U.S. Constitution, which is why it was not discussed under that part of our analysis dealing with the federal civil-rights claims. See R.C. 2744.09(E).