[Cite as *Alexander v. Motorists Mut. Ins. Co.*, 2012-Ohio-3911.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

RONALD M. ALEXANDER,                  :          APPEAL NO. C-110836
                                                TRIAL NO. A-0908307
          Plaintiff-Appellant,        :
                                                 *O P I N I O N.*
   vs.                                :

MOTORISTS MUTUAL INSURANCE            :
COMPANY,
                                      :
          Defendant-Appellee.
                                      :

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  August 29, 2012

*Schwartz Manes Ruby & Slovin* and *Donald B. Hordes*, for Plaintiff-Appellant,

*Freund, Freeze & Arnold* and *Christopher W. Carrigg*, for Defendant-Appellee.

Please note:  This case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

### I. Factual Background

{¶1}   Plaintiff-appellant Ronald M. Alexander appeals from a decision of the trial court granting summary judgment in favor of defendant-appellee Motorists Mutual Insurance Company ("Motorists") in Alexander's suit for conversion, unjust enrichment, tortious interference with a business relationship and tortious interference with a contract.  We find no merit in his single assignment of error, and we affirm the trial court's judgment.

{¶2}   The record shows that Alexander had been an independent insurance salesperson for many years.  He had been an independent contractor with various insurance agencies that were licensed by insurance carriers to sell life, health, automobile, property and casualty, and other insurance policies.  While associated with these agencies, he was authorized or "licensed" to sell the products of those insurance carriers as long as he was affiliated with an agency that was licensed to sell those carriers' products.  Depending on the terms of his contract with the independent agency, the agency paid Alexander a percentage of the commission the agency received based on a percentage of the premiums paid by Alexander's clients.

{¶3}   Alexander's list of clients was referred to in the industry as his "book of business."  He earned his living by generating commissions from his book for his independent agency, and ultimately for himself. Generally, when an independent salesperson like Alexander leaves one agency to go to another, he takes his book with him.

{¶4}    As of early 2005, Alexander had been associated for a number of years with independent agencies licensed to sell insurance policies through Motorists Mutual.   He had placed the vast majority of his clients into policies underwritten by Motorists.   He was a producer at most of these agencies, meaning that he could sell Motorists policies by virtue of the agency's agreement with Motorists.   But, he did not personally have a contract with Motorists, either as an agent or an employee.

{¶5}    In February 2005, Alexander transferred his book of business to Young Insurance Services, an independent agency licensed by Motorists and owned by Cecil Young.   Young and Alexander entered into an "Agent and Manager Contract," which was for a three-year term and set forth the manner in which the parties would divide commissions.   It provided that if at the end of three years Alexander chose not to renew the contract, his book of business belonged to him.   It also stated, "If you break this contract in anyway [sic] you may forfeit all your remaining commissions that was [sic] generated by you and Young Insurance Services."

{¶6}    The relationship between Young and Alexander proved to be contentious.   Young advised Alexander that Alexander had breached the contract and that Young was terminating his services effective September 20, 2005.   But Young also informed Alexander that Young would continue to service Alexander's clients until Alexander transferred his book to another agency, obtained a direct agency contract with Motorists or another company, or sold his book.   Though under the contract Young did not have to pay Alexander any commissions, Young said that he would pay Alexander any commission that Alexander had earned before the effective date of the termination.

{¶7} On October 11, 2011, Young received an email from Motorists district sales manager Dan Sheeran. It stated:

I talked with Columbus [Motorists' home office] today. They want to receive the letter from Cecil stating [that] Mr. Alexander has no authority with the agency effective Sept. 30 and therefore all binding authority with MMIC should also be terminated that date. Further, I need a list of all of Mr. Alexander's accounts that are to be terminated. These account [sic] will be transferred into the home office account effective November 1, 2005 and no further commissions shall be paid.

{¶8} Young was shocked to receive this email. In his experience, no carrier had ever done anything similar. He immediately contacted Sheeran to protest. He told Sheeran that the accounts were Alexander's and that he and Alexander both had a right to commissions from those accounts. He begged Sheeran to let him service the accounts as he had promised Alexander, stating that he needed those accounts to pay those commissions. But Sheeran was adamant that Young had to turn over Alexander's accounts.

{¶9} Fearing that his business relationship with Motorists would be jeopardized, Young reluctantly turned over Alexander's book of business to Sheeran. Following Sheeran's instructions, he sent a letter to Motorists that same day, to which he attached a list of all of Alexander's clients, along with all of the details of their individual policies. From that point, Motorists stopped sending commissions to Young on premiums it received from Alexander's clients.

{¶10} The following day, Motorists sent Alexander a letter advising him that because of his termination from Young's agency, his license to write business for

Motorists was cancelled. The letter did not state that Motorists had demanded that Young transfer Alexander's book to Motorists's home office. In fact, Alexander had been emailing Sheeran asking him for help in placing him in another independent agency or getting a temporary license from Motorists so that he could service his clients.

{¶11} On November 15, 2005, over a month later, Sheeran sent an email to Alexander advising him that effective November 1, his accounts had been transferred to Motorists at Young's request and that he was no longer licensed to service his own clients. Alexander immediately contacted Young, who told him that the transfer was not his idea and that he had had no choice in the matter.

{¶12} Alexander was also a policyholder with Motorists. On November 21, 2005, he received a notice addressed to him as a policyholder, which stated: "This letter is to inform you that Ron Alexander is no longer a licensed representative of our Company, and is no longer servicing the Company in the capacity of an agent for any or all purposes, including claims service and collection of premiums. Your policy(ies) have been placed in a company account."

{¶13} Nobody in the Motorists home office was licensed to service policyholders in the same way as independent agencies like Young's agency. In the next several weeks, Alexander received numerous inquiries from his former clients. Some were unhappy about the lack of response from the home office when they had called. Others complained that Motorists could not service their accounts. Many were angry and a few said that they would take their business elsewhere.

{¶14} Subsequently, Motorists sent out form letters to all of Alexander's former clients advising them that their policies were not being renewed, some on

very short notice. The only reason it gave was that the policyholder's agent was not licensed to represent Motorists.

{¶15} Alexander eventually entered into his own agency contract with another insurance company. In March 2006, he began selling that company's products. While he was able over time to recover most of his prior customers, he lost significant business from former clients who elected to stay with Motorists or retain another insurance agent.

## II. Summary Judgment Generally

{¶16} Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Greene v. Whiteside*, 181 Ohio App.3d 253, 2009-Ohio-741, 908 N.E.2d 975, ¶ 23 (1st Dist.). The trial court has an absolute duty to consider all pleadings and evidentiary materials when ruling on a motion for summary judgment. It should not grant summary judgment unless the entire record shows that summary judgment is appropriate. *Greene* at ¶ 23.

{¶17} Before we begin our analysis of Alexander's assignment of error, we note that Motorists argues that the trial court should not have considered Young's depositions because they were not timely filed. *See* Civ. 56(E); *Waldeck v. N. College Hill*, 24 Ohio App.3d 189, 190, 493 N.E.2d 1375 (1st Dist.1985). The record does not show whether the trial court considered the depositions. But we need not decide the

issue. We review decisions on summary-judgment motions de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Riverhills Healthcare, Inc. v. Guo*, 1st Dist. No. C-100781, 2011-Ohio-4359, ¶ 12. Even if we consider Young's depositions, we find no material issues of fact.

{¶18} Further, Alexander also cites to the Sheeran's deposition. While the record contains a notice of the filing of the deposition, the deposition itself was never actually filed in the trial court. Since it is not part of the record, we cannot consider it. *See Waldeck* at 190.

### III. Conversion

{¶19} In his sole assignment of error, Alexander contends that the trial court erred in granting Motorists's motion for summary judgment. Alexander first argues that the trial court erred in granting summary judgment on his claim for conversion because genuine issues of fact exist as to whether Motorists converted Alexander's book of business.

{¶20} Conversion is the wrongful exercise of dominion or control over property in exclusion of the owner's right, or the withholding of property from the owner's possession under a claim inconsistent with the owner's rights. *Zacchini v. Scripps Howard Broadcasting Co.*, 47 Ohio St.2d 224, 226, 351 N.E.2d 454 (1976), *reversed on other grounds*, 433 U.S. 562, 92 S.Ct. 2849, 53 L.Ed.2d 965 (1977); *Eysoldt v. Proscan Imaging*, 194 Ohio App.3d 630, 2011-Ohio-2359, 957 N.E.2d 780, ¶ 26 (1st Dist.). To prevail on a conversion claim, a plaintiff must demonstrate: (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of the

plaintiff's property right, and (3) damages. *Miller v. Cass*, 3d Dist. No. 3-09-15, 2010-Ohio-1930, ¶ 32; *Dice v. White Family Cos., Inc.*, 173 Ohio App.3d 472, 2007-Ohio-5755, 878 N.E.2d 1105, ¶ 17 (2d Dist.). If the defendant came into possession of the property lawfully, the plaintiff must prove two additional elements to establish conversion: (1) that the plaintiff demanded the return of the property after the defendant exercised dominion or control over the property; and (2) that the defendant refused to deliver the property to the plaintiff. *R&S Distrib., Inc. v. Hartge Smith Nonwovens, LLC*, 1st Dist. No. C-090100, 2010-Ohio-3992, ¶ 23.

{¶21} Once Young terminated Alexander's contract, he was not authorized to act as an agent on behalf of Motorists. He had no license with Motorists and he could not service the accounts in question. Regardless of whether Young had agreed to service the accounts, Motorists was within its rights to transfer the accounts to its home office. Even though its claim that it had no alternative but to accept the transfer of the accounts is disingenuous, it lawfully came into possession of the book of business. *See Chuparkoff v. Farmers Ins. of Columbus, Inc.*, 9th Dist No. 22712, 2006-Ohio-3281, ¶ 39-40.

{¶22} Therefore, the record had to show that Alexander had demanded the return of the property and that Motorists had refused to deliver it to him. But it did not. To the contrary, Sheeran specifically told Alexander that "If you were to be licensed at another agency, we could transfer those accounts back to you for servicing." Therefore, Alexander could not prove all of the elements of conversion, and no genuine issue of fact existed for trial on Alexander's conversion claim.

### IV. Unjust Enrichment

{¶23}   Next, Alexander argues that issues of fact exist for trial on his claim for unjust enrichment.  Unjust enrichment occurs when a party retains money or benefits that in justice or equity belong to another.  *Liberty Mut. Ins. Co. v. Indus. Comm.*, 40 Ohio St.3d 109, 110-11, 532 N.E.2d 124 (1988); *Brose v. Bartlemay*, 1st Dist. No. C-960423, 1997 Ohio App. LEXIS 1478, *12 (Apr. 16, 1997).  To establish unjust enrichment, the plaintiff must demonstrate:  (1) a benefit conferred by the plaintiff on the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.  *Morequity, Inc. v. Fifth Third Bank*, 1st Dist. No. C-080824, 2009-Ohio-2735, ¶ 22.

{¶24}   In determining whether an unjust benefit has been received by a defendant, a court must consider whether the defendant was the party responsible for the plaintiff's detrimental position.  *U.S. Health Practices, Inc. v. Blake*, 10th Dist. No. 00AP-1002, 2001 Ohio App. LEXIS 1291, *6 (Mar. 22, 2001).  Damages for unjust enrichment are the amount of the benefit received.  *Directory Servs. Group v. Staff Builders Internatl., Inc.*, 8th Dist. No. 78611, 2001 Ohio App. LEXIS 3108, *3-4 (July 12, 2001); *U.S. Health Practices* at *5.

{¶25}   In this case, the record does not show that Motorists retained the accounts under circumstances where it would be unjust to do so without payment.  First, Motorists would have received premiums on the accounts regardless of which agent was servicing them.  Second, Motorists did not directly pay commissions to Alexander.  It only owed commissions to Young.  Whether Young paid them to Alexander was determined by the contract between them, not by any action of

Motorists. When Young terminated Alexander's contract, Alexander lost the authority to provide the services on which the commissions were based. Consequently, the record does not show that Motorists was unjustly enriched. Additionally, the record does not contain any evidence of the amount of benefits that were conferred upon Motorists.

### V. Third-Party Beneficiary

{¶26} Alexander also argues that genuine issues of fact exist as to whether he was a third-party beneficiary of the contract between Young and Motorists. Only a party to a contract or an intended third-party beneficiary may claim rights under a contract. *Grant Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161, 566 N.E.2d 1220 (1991); *Caruso v. Natl. City Mort. Co.*, 187 Ohio App.3d 329, 2010-Ohio-1878, 931 N.E.2d 1167, ¶ 23 (1st Dist.).

{¶27} For a person to be a third-party beneficiary, the contract must have been entered into directly or primarily for the benefit of that person, although that person need not be directly named. Nevertheless, an incidental or indirect benefit to a third party is not sufficient to provide the third party with a cause of action. *Grant Thornton* at 161; *Caruso* at ¶ 23; *Brewer v. H & R Concrete, Inc.*, 2d Dist. No. 17254, 1999 Ohio App. LEXIS 277, *8 (Feb. 5, 1999).

{¶28} Nothing in the language of the contract between Young and Motorists indicates that Alexander or any producer was an intended beneficiary. *See Brewer* at *8; *Lin v. Gatehouse Constr. Co.*, 84 Ohio App.3d 96, 100, 616 N.E.2d 519 (8th Dist.1992). In fact, the contract specifically states that "The Agent shall not appoint any subagent, solicitor or broker to act for or on behalf of the Company nor shall the

Agent assign any part of this Agreement or any interest or rights therein or any sum due or to become due the Agent hereunder, without the written consent of the Company."

{¶29}   Alexander argues that the contract refers to "parties who possess vested rights."  But Motorists correctly points out that that phrase only appears in the section concerning retirement of the agent or termination of the agency relationship.  That one reference does not indicate that the parties to the contract intended to benefit Alexander or any other producer.

### VI.  Tortious Interference with a Business Relationship

{¶30}   Alexander contends that genuine issues of fact exist for trial on his claim that Motorists tortiously interfered with his business relationships with his clients.  To prevail on a claim for tortious interference with a business relationship, the plaintiff must show that the defendant intentionally and improperly interfered with the plaintiff's prospective  business relations by either (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing the plaintiff from acquiring or continuing the prospective relation. *Norwell v. Cincinnati*, 133 Ohio App.3d 790, 810-811, 729 N.E.2d 1223 (1st Dist.1999).  A showing of malice, such as ill will, spite or hatred is not required.  *Id.* at 811; *Elwert v. Pilot Life Ins. Co.*, 77 Ohio App.3d 529, 540, 602 N.E.2d 1219 (1st Dist.1991).

{¶31}   The interference must be without justification or privilege.  *Licul v. Swagelok Co.*, 8th Dist. No. 86322, 2006-Ohio-711, ¶ 28; *Norwell* at 811.  The plaintiff bears the burden of showing that the defendant's interference lacked

11

justification. *Licul* at ¶ 29. Courts have refused to allow claims on the grounds that the defendant was privileged to protect its own business relationships or that the plaintiff presented no evidence of the defendant's intent to interfere. *Elwert* at 537.

{¶32} Motorists contends that it had no alternative but to accept the transfer of files in order to service the accounts of its insureds. The evidence does not support this statement. Nevertheless, the record does not contain any evidence showing that the taking of the accounts was improper. *See Chuparkoff*, 2006-Ohio-3281, at ¶ 36-37. Motorists was justified in doing so under its contract with Young. Further, the catalyst for all of Alexander's problems was Young's termination of the contract between them. Alexander could not service the accounts after Young terminated the contract until he obtained a license with another agent. Motorists indicated that it would return the accounts to him for servicing when he obtained a license. Consequently, it did not induce or cause any of Alexander's clients not to continue their relationship with him.

### VII. Tortious Interference with Contract

{¶33} Alexander next argues that genuine issues of material fact exist on his claim that Motorists tortiously interfered with the contract between him and Young Insurance Services. The elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (1995), paragraph two of the syllabus. The fourth element, lack of justification, requires proof that the defendant's interference with

the contract was improper. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999), paragraph two of the syllabus. Ohio law places the burden of proving a lack of privilege or justification upon the plaintiff. *Andrews v. Carmody*, 145 Ohio App.3d 27, 33, 761 N.E.2d 1076 (11th Dist.2001).

{¶34} The record shows that Young terminated the contract with Alexander due to disputes between them, not due to any action by Motorists. Arguably, Young and Alexander had an oral contract that Young would service Alexander's accounts until he could handle them himself. But, again, the evidence does not show that Motorists's decision to service the accounts itself was improper even if it was detrimental to Alexander's interests.

### *VIII. Summary*

{¶35} In sum, we find no issues of material fact. Construing the evidence most strongly in Alexander's favor, reasonable minds can come to but one conclusion—that Alexander could not prevail on any of his claims. Motorists was entitled to judgment as a matter of law, and the trial court did not err in granting summary judgment in its favor. Consequently, we overrule Alexander's assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**SUNDERMANN, P.J.,** and **HENDON, J.,** concur.

Please note:

The court has recorded its own entry this date.