[Cite as *Cincinnati v. Triton Servs., Inc.*, 2019-Ohio-3108.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CITY OF CINCINNATI, | : | APPEAL NO. C-170705 |
| | | TRIAL NO. A-1405757 |
| Plaintiff-Appellee/Counterclaim-Defendant, | : | |
| | | *OPINION.* |
| | : | |
| vs. | | |
| | : | |
| TRITON SERVICES, INC., | | |
| | : | |
| Defendant-Appellant/ Counterclaim-Plaintiff, | : | |
| | | |
| OHIO FARMERS INSURANCE COMPANY, | : | |
| | : | |
| and | | |
| | : | |
| MAJID H. SAMARGHANDI, | | |
| | : | |
| Defendants/Counterclaim-Plaintiffs, | : | |
| | | |
| and | : | |
| | | |
| TRITON PROPERTIES, LLC, | : | |
| | | |
| Defendant. | : | |

| | | |
|---|---|---|
| TRITON SERVICES, INC., | : | APPEAL NO. C-170705 |
| | | TRIAL NO. A-1500905 |
| Plaintiff-Appellant/Counterclaim-Defendant, | : | |
| | | |
| | : | |
| vs. | | |
| | : | |
| CITY OF CINCINNATI, A MUNICIPAL CORPORATION, | : | |
| | | |
| | : | |
| Defendant-Appellee/ Counterclaim-Plaintiff. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:    Affirmed in Part, Reversed in Part, and Cause
                              Remanded

Date of Judgment Entry on Appeal:  August 2, 2019


*Paula Boggs Muething*, City Solicitor, *Joseph C. Neff*, Assistant City Solicitor, and *Taft Stettinius & Hollister, LLP, Earl K. Messer* and *Nicolas J. Pieczonka*, for the City of Cincinnati,

*Stites & Harbison, PLLC, William G. Geisen* and *Andrew J. Poltorak*, for Triton Services, Inc., Ohio Farmers Insurance Company, and Majid H. Samarghandi.

**WINKLER, Judge.**

{¶1}  Appellant Triton Services, Inc., ("Triton") appeals several orders entered against it in favor of appellee city of Cincinnati ("the city") in two consolidated cases.  We find merit in four of Triton's eight assignments of error.  We therefore affirm the trial court's judgment in part and reverse it in part.

### The Wesselman/Carroll Projects

{¶2}  The record shows that in April 2008, Triton entered into a contract with the city, acting  on behalf of the Metropolitan Sewer District ("MSD").  Under the contract, Triton was the general contractor performing sewer work for the Wesselman Road Interceptor Sewer Phase 1A-3 and 1B project ("Wesselman Project").  Subsequently, Triton entered into another contract with the city to perform the Carroll Avenue Sewer Replacement Project ("Carroll Project").  Ohio Farmers Insurance Company provided surety bonds for both projects.

{¶3}  In June 2011, the city issued three checks totaling $496,256.09 to Triton for the work it had performed on the Wesselman and Carroll Projects.  Triton deposited the checks into its bank account.  Several months later, the city discovered that Pavement Management, one of Triton's subcontractors, had not been paid.  The city took steps to stop payment on the checks it had issued to Triton.  The city was erroneously informed by its bank that the payment had been stopped.

{¶4}  Subsequently, Pavement Management filed suit against Triton and the city, seeking the money that it was owed for its work on the projects.  To resolve that lawsuit, the city paid $396,756.09 to Triton and $99,500 to Pavement Management.

{¶5}  In January 2014, the city discovered that the checks for the original payments of $496,256.09 had not been stopped because the stop-payment orders had been issued too late.  After the city discovered the accidental double payment, it

sent numerous letters to Triton requesting the return of the original payment of $496,256.09. Triton never returned the payment.

{¶6} Subsequently, in the case numbered A-1405757, the city filed a complaint against Triton alleging unjust enrichment and breach of contract. The city also named Ohio Farmers Insurance Company ("Farmers") as a defendant and made a claim under the surety bonds on the projects. In conducting discovery, it learned that Triton knew that the city's checks were fully deposited into Triton's checking accounts and that the relevant funds were never returned to the city. In fact, the overpayment was transferred between numerous bank accounts.

{¶7} Consequently, the city amended its complaint to add claims for fraud and punitive damages against Triton and Majid H. Samarghandi, Triton's CEO. In response, Triton and Samarghandi asserted counterclaims for abuse of process and frivolous conduct, in which they alleged that the city had filed the fraud claim to harass them and force them to surrender the payment.

{¶8} Eventually, the city withdrew its fraud and punitive-damages claims. The trial court granted summary judgment in favor of the city on its unjust-enrichment claim and awarded the city $496,256.09. The court also granted summary judgment in favor of the city on Triton's claim for abuse of process. As to the claim for attorney fees for frivolous conduct, the court found that the issue should have been raised by motion rather than in Triton's counterclaim. The court stated that the evidence related to frivolous conduct should not be presented to the jury, but that it would allow Triton to raise the issue by motion after the trial of the other issues raised in a consolidated case.

### *The Sagebrush Project*

{¶9}   In July 2011, Triton entered into a contract with the city to perform work on the Sagebrush Lane, Susanna Drive, and Yellowstone Drive sewer project ("Sagebrush Project").  The original contract amount was $2,698,440.  The contract incorporated the bid booklet, the State of Ohio Department of Transportation Construction and Material Specifications ("ODOT CMS"), and the city of Cincinnati's supplement to the ODOT CMS.

{¶10} A geotechnical report was incorporated into the bid booklet.  It provided that "excavations for the sewer are anticipated to primarily encounter cohesive soils interbedded occasionally with cohesionless soils."  The report stated that no water was found at a majority of the test borings, which led to the recommendation that trench excavations be performed in 50-foot sections with each section being backfilled before proceeding to the next trench excavation.  The bid booklet stated that the geotechnical report was for informational purposes only and that the report was not a substitute for actual site inspection.

{¶11}  Triton began work on the Sagebrush Project in September 2011.  Soon after, it discovered differing soil conditions than it had expected.  Triton claimed that it had encountered sloughing soils, trench cave-ins, excessive groundwater, and extremely wet conditions, which caused it to incur substantial increased expenses.

{¶12} The contract spelled out what should occur if Triton encountered differing site conditions.  ODOT CMS ¶ 104.02(B) provided:

> During the progress of the Work, if subsurface or latent
> physical conditions are encountered at the site differing materially
> from those indicated in the Contract Documents or if unknown
> physical conditions of an unusual nature, differing materially from
> those ordinarily encountered and generally recognized as inherent in

the Work provided for in the Contract Documents, are encountered at the site, notify the Engineer as specified in 104.05 of the specific differing conditions before they are disturbed or the affected Work is performed.

Upon notification, the Engineer will investigate the conditions and if it is determined that the conditions materially differ and cause an increase or decrease in the cost or time required for the performance of any Work under the Contract, the Department will make an adjustment and modify the Contract as specified in 108.06 and 109.05. The Engineer will notify the Contractor of the determination whether or not an adjustment of the Contract is warranted.

The "Engineer" was defined as a "[d]uly authorized agent of the Department acting within the scope of its authority for purposes of engineering and administration of the Contract." ODOT CMS ¶ 101.03.

{¶13} ODOT CMS 104.05(D), as amended by the city supplement, required the contractor to:

Give written notice of any circumstance or dispute on the project that may result in a claim. Give early notice by the end of the second working day following the discovery of the occurrence of the circumstance or dispute. Maintain records on the Superintendent's daily report of the additional labor, equipment, and materials used on the disputed work or made necessary by the circumstance. Begin record keeping when the project personnel are aware of the circumstance of dispute. Submit these records on a weekly basis.

This section further states that "[f]ailure to give early notice or keep and submit cost records will be a sufficient reason for the City to deny the claim."

{¶14} According to Triton, Brian Gessner, Triton's director of site development, discussed the differing site conditions frequently with city representatives throughout the project, including Steve Jones, the supervising engineer for the Sagebrush Project. Triton also contended that it sent numerous written notices to the city relating to the differing site conditions.

{¶15} On February 1, 2012, Gessner sent an email to Sara Cramer, MSD's construction manager for the Sagebrush Project. Gessner advised Cramer of the poor condition of the water mains at the site and that there had been three water main breaks at the site, causing "undue saturation" of the "surrounding subsurface." He also expressed concern about the future impact of the water mains on Triton's work.

{¶16} On March 7, 2012, Gessner sent a letter to Cramer stating,

As I am sure you have witnessed by your numerous site visits, review of the inspector's daily notes as well as Tritons [sic] notifications both verbally and as was addressed in last week's meeting, the bore and trench excavations have exposed poor ground conditions at every excavation completed on the upper subdivision part of the project and are currently experiencing [m]ajor delays. The soil strata have consisted of large seams of sand as well as groundwater that are inconsistent with the bore reports.

He stated that the field operations should be delayed and asked for a meeting to discuss the problems.

{¶17} On March 15, 2012, Gessner sent another email to Cramer discussing the wet site conditions. At that time, the differing site conditions had brought

7

Triton's work on the project to a standstill, and it was waiting on a proposal from MSD so that it could continue with its work on the project. Gessner also stated that he had been in "continuous communication" with Jones on those issues.

{¶18} On March 16, 2012, Gessner sent Cramer documentation regarding additional trench protection that Triton's crews would need to use due to the site conditions. He advised her that the additional trench protection would cause Triton to incur additional costs. As of March 19, 2012, work remained at a standstill. Gessner sent an email to Cramer and Jones requesting that they approve the extra costs associated with more substantial trench boxes, the use of which was necessitated by the sloughing and saturated soils. MSD agreed to pay those costs, and Triton was able to continue work on the project.

{¶19} On May 21, 2012, Gessner sent an email to Cramer advising her that soil conditions on the west end of Susanna Drive were unsuitable due to saturated and sloughing soils and approximately four inches of water, which would cause Triton additional costs. He asked Cramer to confirm conditions with MSD's field staff and to confirm that MSD would pay for Triton's additional costs.

{¶20} In early June 2012, Gessner and Cramer exchanged emails regarding the deteriorated and unsuitable subbase on the project. Gessner advised Cramer that the unforeseen conditions had caused compromised trench walls during the mainline pipe operations, causing Triton to incur costs for additional materials and labor.

{¶21} Gessner also indicated that work on the project had been delayed. Triton contended that while work was stopped, Jones had directed Gessner to wait and submit all costs incurred due to differing site conditions at the end of the project. The city contends that Jones only told him to submit costs for certain discrete parts of the project.

{¶22} On June 26, Gessner sent an email in which he requested that Cramer visit the job site. He attached a photograph showing sloughing soils, trench cave-ins and deteriorated subbase. In July, he sent Cramer a series of photographs showing the deteriorated subbase on Susanna Drive, east of Flattop Drive.

{¶23} On July 24, 2012, Jones sent an email to Patrick Arnette, MSD's principal engineer. He stated,

> This is likely the most difficult project I have seen since I have been in the construction section. Fill soils in excavation, angry and resistant residents towards the project, rain in Fall and Winter working near the creeks, 105 degree heat and no rain in the summer working in the streets, an unqualified contract duration, communication on the project from numerous entities, a design that does not allow traffic, mismarked and failing utilities, unrealistic expectations from residents, confrontational and deceitful residents, a contractor without a full crew at the beginning of the project[.] * * * I have said since the beginning of the project that we may all do great work but we will all receive black eyes at the end of this project. Where others see failure, I see success by MSD and Triton. The contractor went from a half crew to 4 crews on the job, save 3 to 4 months on the contract time using a new more costly boring method, has done a remarkable job communicating and trying to get traffic through the work areas.

Jones would later state that the project was difficult primarily due to the residents and secondarily due to all of the entities involved.

{¶24} James Wilmes was MSD's on-site inspector for the project. Typically, he was at the site for ten hours per day. As part of his duties, he would prepare an "Inspector Daily Report" ("IDR"), in which he would document his observations. He

also took photographs of the site conditions. According to Triton, the IDRs supported its claims of differing site conditions. The city contended that Wilmes's job was not to inspect subsurface conditions at site, and he did not have the training and experience to make those kinds of determinations. Wilmes stated that he had no reason to conduct any further inspections into ground-water conditions and that he would have referred any issues with subsurface conditions to the engineer.

{¶25} Triton completed the trench excavations by August 28, 2o12. Though the contract had an expiration date of September 21, 2012, the job continued after that date. Part of the reason was that Triton had to temporarily stop work on the project for Colerain Township to install new curbs. Triton finished the final work, mostly involving the final grinding and paving of the roads, on December 12, 2012.

{¶26} On November 19, 2012, Triton submitted change order request ("COR") #5 relating to unforeseen ground conditions at manholes three through six in the mainline pipe installation. The associated work occurred between February 27, 2012, and April 9, 2012. It stated "[a]s per the notification via the attached letter dated 6/4/12 and the Time Impact Analysis dated 6/26/2012, Triton has incurred the additional costs as listed below as a result of the differing site conditions." MSD approved that change order request through Construction Change Order ("CCO") #7 on October 3, 2014.

{¶27} On November 19, 2012, Triton also submitted COR #3 related to unforeseen ground conditions during the bore at manhole number three. The work associated with that bore occurred between November 1 and 11, 2011. MSD approved that change order request through CCO #6 on September 2, 2013.

{¶28} On March 15, 2013, eight months after it had finished trench excavations, Triton submitted COR #6 for unforeseen ground conditions at manholes three through six. The work associated with that request occurred

10

between February 27, 2012, and April 9, 2012. Triton again referenced its letter of June 12, 2012, and the Time Impact Analysis dated June 26, 2012. Triton contended that it had submitted this request at that time because Jones had requested that Triton gather all costs associated with the differing site conditions and submit those requests after the conclusion of the project. MSD approved this change order request through CCO #6 on September 2, 2013.

{¶29} On March 15, 2013, Triton also submitted COR #7 for additional concrete roadway restoration due to the deteriorated road base. It stated that it had submitted the request after the conclusion of the project, per Jones's request. MSD approved COR #7 through CCO #7.

{¶30} Finally, on March 19, 2013, Triton submitted COR #14 for expenses incurred due to undocumented, unsuitable ground conditions throughout the project. Again, it claimed that it had submitted this request at that time because Jones had requested that it submit all change order requests after work on the project was finished. Triton requested additional compensation of $534,321.65. Gessner calculated that amount by using what Triton contends was a total-cost method. It supported that request with a binder full of information that contained numerous photographs and copies of numerous IDRs, which it contended documented its claim for differing site conditions.

{¶31} After the city refused to approve COR #14, Triton filed a complaint in the case numbered A-1500905 alleging breach of contract. It sought damages for the unpaid contract balance, costs related to the differing site conditions, extended and unabsorbed home office overhead, interest, and attorney fees. The city filed a counterclaim for breach of contract and indemnification. At Triton's request, the trial court consolidated that case with the case numbered A-1405757.

{¶32} Subsequently, the city filed two motions in limine. In its first motion, the city asked the court to exclude the testimony of Brian Gessner, Triton's director of site development, relating to Triton's damages for the differing-site-conditions claim because he did not use a proper method to calculate those damages, and the damages were purely speculative. In its second motion, the city asked the court to exclude evidence related to Triton's claim for differing site conditions due to spoliation of the evidence. It argued that Triton had failed to preserve evidence necessary for it to rebut Triton's claims that the soil conditions it encountered on the Sagebrush Project were different than those stated in the contract. The trial court granted both motions in limine.

{¶33} The court granted summary judgment in favor of Triton and Farmers on the city's claims against the performance and payment bonds. The trial court also granted summary judgment in favor of the city on Triton's claims for its home office overhead and for attorney fees.

{¶34} But the court denied the city's motion for summary judgment on Triton's differing-site-conditions claim. The court stated that a genuine issue of material fact existed "as to whether the subsurface conditions at the site materially differed from those indicated in the geotechnical engineering report that the city issued with the bid documents."

{¶35} Thus, the only issue remaining for trial was Triton's differing-site-conditions claim. On October 23, 2017, a jury trial commenced. Triton and the city entered into an agreement resolving some of the claims, which included dismissing the jury and proceeding to a bench trial. Triton proffered the evidence that it would have presented had that evidence not been excluded. The trial court then granted the city's motion for a "directed verdict" on the differing-site-conditions claim. On

12

November 28, 2017, the court journalized a judgment entry incorporating all of its previous rulings. This appeal followed.

{¶36} Triton presents eight assignments of error for review, which we address out of order. We will discuss the assignments of error related to the Sagebrush Project first and then the assignments of error related to the Wesselman/Carroll projects.

### *Spoliation of Evidence*

{¶37} In its first assignment of error, Triton contends that the trial court erred in granting the city's motion in limine precluding Triton from presenting evidence concerning differing site conditions due to spoliation of evidence. The basis of the city's spoliation argument was that Triton had failed to collect and preserve soil samples at the job site to support its differing-site-conditions claim. Triton argues that the court abused its discretion, because the threshold showing of spoliation had not been met. In its second assignment of error, Triton contends that the trial court erred in precluding Triton from presenting evidence regarding soil conditions at the site and any difference between the soil conditions it had encountered and the soil conditions it expected at the Sagebrush Project site as a sanction for spoliation of evidence. We sustain these assignments of error.

{¶38} The doctrine of spoliation of the evidence may be raised in a number of ways including as an affirmative defense or by motion. The effect of the doctrine, when applied in a defensive manner, is to allow the defendant to exculpate itself from liability because the plaintiff has barred it from obtaining evidence necessary to prove the existence or absence of the essential elements of the claim. *Loukinas v. Roto-Rooter Servs. Co.*, 167 Ohio App.3d 559, 2006-Ohio-3172, 855 N.E.2d 1272, ¶ 12 (1st Dist.). A trial court may exclude expert testimony as a sanction for spoliation

of the evidence if it determines that evidence has been intentionally altered or destroyed by a party or its expert before the defense has had an opportunity to examine the evidence. *Id.* at ¶ 13; *Hetzer-Young v. Elano Corp.*, 2d Dist. Greene No. 2013-CA-32, 2014-Ohio-1104, ¶ 29; *Cincinnati Ins. Co. v. Gen. Motors Corp.*, 6th Dist. Ottawa No. 94OT017, 1994 WL 590566, *3 (Oct. 28, 1994).

{¶39} The city does not contend that Triton destroyed soil samples. Instead, it argues that Triton failed to collect and preserve them. Nothing in the record shows that Triton had a duty to collect soil samples, and the city never asked Triton to provide soil samples. The contract for the Sagebrush Project did not require Triton to do so. Further, the contract gave the city the right to inspect job-site conditions at any time so it could have collected its own soil samples, if needed.

{¶40} The city contends that Triton failed to give it proper notice of the condition of the soil as provided for in the contract. That is a separate contractual issue, which is irrelevant to the doctrine of spoliation of the evidence. That issue was never fully addressed because of the trial court's decisions granting the two motions in limine, an issue we discuss more fully under Triton's eighth assignment of error.

{¶41} Thus, the doctrine of spoliation of evidence is not implicated in this case because no evidence existed to be destroyed. Sanctions and causes of action for spoliation of evidence are designed to place responsibility and accountability on parties who were actually in possession of evidence that existed at one time but who later failed to provide the evidence without adequate explanation. *Wheatley v. Marietta College*, 2016-Ohio-949, 48 N.E.3d 587, ¶ 105 (4th Dist.); *Keen v Hardin Mem. Hosp.*, 3d Dist. Hardin No. 6-03-08, 2003-Ohio-6707, ¶ 16. "Non-existent evidence, by its very nature, cannot be spoiled." *Keen* at ¶ 16.

{¶42} Consequently, we hold that the trial court erred in granting the city's motion in limine and in precluding Triton from presenting evidence regarding soil

conditions at the Sagebush Project site based on spoliation of evidence. We sustain Triton's first and second assignments of error.

### *Testimony on Damages for Differing-Site-Conditions Claim*

{¶43} In its third assignment of error, Triton contends that the trial court erred in precluding Gessner from testifying in support of its claim for damages relating to differing site conditions. It argues that the evidence was probative and was calculated with a reasonable degree of certainty, and therefore, should not have been excluded. We find this assignment of error to be well taken, although not precisely for the reasons Triton states.

{¶44} We note that the city argues in its brief that Gessner was not qualified as an expert witness under Evid.R. 702, which was not the basis of its motion to exclude his testimony about damages in the trial court. In its motion, the city had argued that the probative value of the testimony on damages was substantially outweighed by the danger of unfair prejudice under Evid.R. 403(A). Its argument was threefold: (1) that Gessner's damage calculation was based on documents that Triton had lost, disposed of, or intentionally withheld; (2) that Gessner could not explain the basis of his damage calculation; and (3) that Gessner's calculation did not conform to the requirements of a total-cost claim.

{¶45} The trial court has broad discretion in determining whether evidence should be excluded under Evid.R. 403(A). A reviewing court will not reverse that decision absent an abuse of discretion. *State v. Simms,* 1st Dist. Hamilton Nos. C-030138 and C-030211, 2004-Ohio-652, ¶ 4; *Cincinnati v. Banks,* 143 Ohio App.3d 272, 287, 757 N.E.2d 1205 (1st Dist.2001).

{¶46} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair

prejudice, of confusion of the issues, or of misleading the jury." Exclusion of evidence under Evid.R. 403(A) requires more than mere prejudice, it requires unfair prejudice. *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001); *Conway v. Dravenstott*, 3d Dist. Crawford No. 3-06-05, 2006-Ohio-4840, ¶ 11. "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin* at 172. If evidence "arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish," it may be unfairly prejudicial. *Id.*; *Conway* at ¶ 11. "Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect." *Oberlin* at 174.

{¶47} The contract required the use of a measured-mile analysis to quantify labor inefficiencies. Triton originally stated that its damages were based on a measured-mile analysis. Using that analysis, it presented a much lower figure for damages than it claimed later in the proceedings. Gessner testified that due to the nature of the work it was impossible to do a measured-mile analysis.

{¶48} Later, Triton claimed to be using the total-cost method, which Gessner acknowledged he had no experience calculating. He stated that he had never used the calculation he had relied upon in determining Triton's damages for the alleged differing-site-conditions claim. He stated he did his "best effort at a total costs method," and that his opinion was not based on any construction journal or industry standard.

{¶49} We cannot hold that any of the alleged defects in Gessner's testimony would have caused the city unfair prejudice. Gessner's testimony would not appeal to a jury's emotions rather than its intellect. It also would not arouse a jury's emotional sympathies, evoke a sense of horror, or appeal to an instinct to punish. The city contends that Gessner's estimate of damages was speculative and based on

conjecture. *See Kahn v. CVS Pharmacy, Inc.*, 165 Ohio App.3d 420, 2006-Ohio-Ohio-112, 846 N.E.2d 904, ¶ 25 (1st Dist.); *Hollobaugh v. D & V Trucking*, 7th Dist. Mahoning No. 99 CA 303, 2001 WL 537058, *5 (May 8, 2001). But any defects in Gessner's testimony go to its weight, not its admissibility.

{¶50} Under the circumstances, we hold that the trial court's decision to grant the motion in limine excluding Gessner's testimony on damages was an abuse of discretion. We make no decision as to whether Gessner's testimony was proper expert testimony under Evid.R. 702 since the trial court did not decide the motion in limine on that basis. We, therefore, sustain Triton's third assignment of error.

### Home-Office-Overhead Damages

{¶51} In its fourth assignment of error, Triton contends that the trial court erred in granting partial summary judgment in favor of the city on Triton's claim for home-office-overhead damages related to the city's unilateral extension of the project from September 2012 to June 2013. It argues that issues of fact exist as to whether it was entitled to those damages. This assignment of error is not well taken.

{¶52} An appellate court reviews a trial court's ruling on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Wal-Mart Realty Co. v. Tri-County Commons Assoc., Ltd.*, 1st Dist. Hamilton No. C-160747, 2017-Ohio-9280, ¶ 8. Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Wal-Mart Realty Co.* at ¶ 8.

{¶53} Home office overhead is the cost of running a contractor's home office during a government-caused delay. *Complete Gen. Constr. Co. v. Ohio Dept. of Transp.,* 94 Ohio St.3d 54, 55, 760 N.E.2d 364 (2002). Contractors cover overhead costs by spreading the costs proportionally across ongoing projects. When an owner-caused delay substantially diminishes a project's cash flow, the contractor's fixed overhead costs are not absorbed by the delayed project and must be absorbed by other projects. If a contractor is unable to take on other construction projects during the period of the delay, the contractor's overhead costs are not absorbed by the project to which they were apportioned. *Id.* at 57; *Royal Elec. Constr. Co. v. Ohio State Univ.,* 10th Dist. Franklin Nos. 93AP-399 and 93AP-424, 1993 WL 532013 *6 (Dec. 21, 1993).

{¶54} In *Complete Gen. Constr. Co.*, the Ohio Supreme Court adopted what is known as the *Eichleay* formula "an equation employed by federal courts for determining such costs." *Complete Gen. Constr. Co.* at 55. It is "the most well-known formula for calculating unabsorbed overhead" costs arising out of government-caused delay. *Id.,* quoting Shapiro & Washington, *Use of the* Eichleay *Formula to Calculate Unabsorbed Overhead for Government Caused Delay Under Manufacturing Contracts*, 25 Pub.Contr.L.J. 513, 514 (1996). The Supreme Court did note, however, that the *Eichleay* formula is not the only way to determine unabsorbed home-office-overhead damages. *Complete Gen. Constr. Co.* at 61.

{¶55} Before that formula may be applied, the contractor must demonstrate two important elements to establish a prima facie case. First, the contractor must show that it was on "standby." A contractor is on standby "when work on a project is suspended for a period of uncertain duration and the contractor can at any time be required to return to work immediately." *Complete Gen. Constr. Co.* at 58, quoting *West v. All State Boiler, Inc.,* 146 F.3d 1368, 1373 (Fed.Cir.1998). In effect, the

contractor is not working on the project, yet remains bound to the project. The contractor must be ready to immediately resume performance at any time. Second, the contractor must show that it was unable to take on any other work while on standby. That is, it must show that the uncertainty of the duration of the delay made it unable to commit to replacement work on another project. *Complete Gen. Constr. Co.* at 58-59.

{¶56} The government can rebut the contractor's prima facie case by demonstrating either (1) that it was not impractical for the contractor to obtain replacement work during the delay, or (2) that the contractor's inability to obtain or perform work was not caused by the government's suspension. *Complete Gen. Constr. Co.*, 94 Ohio St.3d at 59, 760 N.E.2d 364. "The *Eichleay* formula goes nowhere without causation." *Id.* at 60. A contractor may recover only if there is an owner-caused delay. *Id.*

{¶57} The contract language in the present case is similar to the contract language in *Complete Gen. Constr. Co.* It provides that "[t]he City will only pay for the Contractor's home office overhead if all work on the project is suspended at no fault of the Contractor, the length of the suspension is unknown, the Contractor's crews are put on standby, and the Contractor cannot get replacement work for the time period of the suspension."

{¶58} First, the record shows that some of the delay was not caused by the city. The delay from September 2012 to December 2012 was caused by the installation of curbs by Colerain Township, which is not a party to either suit. Gessner acknowledged that he knew Triton would return to work on the project when the curbs were installed.

{¶59} Triton contends that the city caused a nine-month suspension from September 2012 until June 2013. The record shows that the city had a policy in

which it extends a contract for at least nine months past its final completion date to negotiate change orders and close out the contract. Since Triton finished its work in December 2012, it is difficult to say that the city's extension for closing out the project caused Triton to incur additional home-office-overhead costs. But, even if we attribute all the delay to the city, nothing in the record shows that the city put Triton on "standby" status during that time.

{¶60} Further, Triton was not prevented from accepting other work from September 2012 through June 2013. In granting summary judgment to the city on Triton's claim for unabsorbed home office overhead, the trial court stated,

> Triton's own employee time records show that its employees were working on various replacement projects from September 2012 (contract completion date) and December 2012 (the date Triton admits its work on the project was completed). Mr. Gessner's inability to recall whether Triton passed up other opportunities is not sufficient to create an issue of fact concerning whether Triton was prevented from obtaining replacement work as a result of the Sagebrush Project. Triton failed to locate or produce any admissible record or evidence that shows that Triton was unable to undertake replacement work as a result of the Sagebrush Project. The burden is on Triton to set forth specific facts showing there is a genuine issue for trial.

The record supports the trial court's assessment.

{¶61} We find no issue of material fact. Construing the evidence most strongly in Triton's favor, reasonable minds can come to but one conclusion—that Triton did not suffer home-office-overhead damages. The city was entitled to judgment as a matter of law, and the trial court did not err in granting summary

judgment to the city on that issue. Consequently, we overrule Triton's fourth assignment of error.

### *Directed Verdict/Motion to Dismiss*

{¶62} Finally, in its eighth assignment of error, Triton contends that the trial court erred in granting the city's motion for a directed verdict. It contends that the court's prior rulings erroneously prevented it from pursuing its claims in the action. This assignment of error is well taken, although not precisely for the reasons Triton argues.

{¶63} When the case proceeded to trial, it was heard by a visiting judge. The visiting judge advised the parties that he would not change any of the assigned judge's evidentiary rulings. Triton and the city entered into an agreement resolving some of the claims, which included dismissing the jury and proceeding to a bench trial. The court permitted Triton to proffer the evidence it would have presented if that evidence had not been excluded by the motions in limine before granting the motion for a directed verdict.

{¶64} Civ.R. 50(A)(4) governs motions for a directed verdict. A ruling on a motion for a directed verdict determines whether the evidence was sufficient to proceed to a jury. *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986); *Williams v. Sharon Woods Collision Ctr. Inc.*, 2018-Ohio-2733, 117 N.E.3d 57, ¶ 14 (1st Dist.). Therefore, directed verdicts are inapplicable in bench trials where no jury exists. *Hayes v. Carrigan*, 2017-Ohio-5867, 94 N.E.3d 1091, ¶ 21 (1st Dist.).

{¶65} Instead, a defendant in a nonjury action must move for an involuntary dismissal under Civ.R. 41(B)(2) at the close of the plaintiff's evidence. *Id.* Therefore, we will treat Triton's assignment of error as one challenging the trial court's decision to grant a dismissal under Civ.R. 41(B)(2). *See id.*

{¶66} When ruling on a Civ.R. 41(B)(2) motion to dismiss, a trial court is entitled to weigh the evidence presented. It is not required to view the evidence in the light most favorable to the plaintiff. *Goering v. Chriscon Builders Ltd.*, 1st Dist. Hamilton No. C-100729, 2011-Ohio-5480, ¶ 16. A reviewing court may not set aside the trial court's judgment on such a motion unless the judgment was erroneous as a matter of law or against the manifest weight of the evidence. *Id.*

{¶67} We have already held that the trial court erred in excluding Triton's evidence regarding differing site conditions and Gessner's testimony regarding damages. Because the court did not consider that evidence, its judgment on the motion to dismiss was erroneous as a matter of law. Consequently, we sustain Triton's eighth assignment of error and reverse the trial court's decision granting the motion to dismiss. We remand the cause for a new trial on Triton's differing-site-conditions claim under the provisions of the contract.

### *Unjust Enrichment*

{¶68} We now address Triton's assignments of error related to the Wesselman/Carroll Projects. In its fifth assignment of error, Triton contends that the trial court erred in granting summary judgment in favor of the city on the city's claim for unjust enrichment. Triton argues that genuine issues of material fact exist as to whether it would be inequitable for it to repay $496,256.09 to the city based on the city's mistaken payment of additional sums to Triton. This assignment of error is not well taken.

{¶69} Unjust enrichment occurs when a party retains money or benefits that in equity belong to another. *Liberty Mut. Ins. Co. v. Indus. Comm.*, 40 Ohio St.3d 109, 110-111, 532 N.E.2d 124 (1988); *Alexander v. Motorists Mut. Ins. Co.*, 1st Dist. Hamilton No. C-110836, 2012-Ohio-3911, ¶ 23. To establish unjust enrichment, the

plaintiff must demonstrate: (1) a benefit conferred by the plaintiff on the defendant; (2) knowledge by the defendant of that benefit; and (3) retention of that benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984); *Alexander* at ¶ 23.

{¶70} Triton argues that it was entitled to the first payment of $496,256.09 at the conclusion of the Wesselman/Carroll Project. Pavement Management did not assert claims against the city until six months after the project had been completed. Triton denied that it had contracted with Pavement Management and that it was liable to pay it any amount. Triton argues that it was entitled to receive, deposit and retain the first payment that it had earned by its performance of the work on the Wesselman/Carroll Project.

{¶71} As to the second, mistaken payment, Triton contends that genuine issues of fact exist as to whether the city breached a duty imposed on it by law in making the second payment. It argues that the city was obligated by law to account for its own expenditures and reconcile its own accounts. Therefore, genuine issues of material fact existed as to whether it would be unconscionable for Triton to retain the benefits conferred on it, and whether the city is precluded from recovery by its own failure to carry out its obligations.

{¶72} We find no merit in Triton's arguments. The record shows that Triton was paid twice for its work on the Wesselman/Carroll Projects. The trial court was correct when it stated,

> Since January 2014 the City's position has not changed with regard to the receipt or lack of receipt of the funds in question. Triton has not located any bank documents which contradict the [bank's] records. Triton was aware that it still possessed the funds in 2011. Triton has

failed to present any evidence to show the return of the overpayment to the City. Majid Samarghandi and Triton knew that the City's checks were deposited into Triton's checking accounts and the relevant funds were never returned to the City.

{¶73} Triton is essentially arguing that it should be able to take advantage of a simple mistake by the city. We find no issue of material fact. Construing the evidence most strongly in Triton's favor, reasonable minds can come to but one conclusion—that Triton was unjustly enriched when it failed to return the mistaken payment. The city was entitled to judgment as a matter of law, and the trial court did not err in granting summary judgment in its favor on its claim for unjust enrichment. Consequently, we overrule Triton's fifth assignment of error.

### *Abuse of Process*

{¶74} In its seventh assignment of error, Triton contends that the trial court erred in granting summary judgment in the city's favor on Triton's claim for abuse of process. It argues that the trial court applied the wrong standard and improperly concluded that Triton had failed to present "clear evidence" of the elements of abuse of process. This assignment of error is not well taken.

{¶75} To establish a claim for abuse of process, a plaintiff must show (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from that wrongful use of process. *Robb v. Chagrin Lagoons Yacht Club,* 75 Ohio St.3d 264, 270, 662 N.E.2d 9 (1996); *Losch & Assoc., Inc.,* 1st Dist. Hamilton No. C-150716, 2016-Ohio-4950, ¶ 22. "[A]buse of process occurs when someone attempts

to achieve through use of the court that which the court is itself powerless to order." *Robb* at 271.

{¶76} Triton takes the trial court's statement that it failed to present "clear evidence" out of context. The abuse-of-process claim was based on the allegation that the city had brought its fraud claim for the improper purpose of forcing Triton to pay the city $495,256.09, the amount of the mistaken payment to Triton, and punitive damages. As the trial court pointed out, "The entire basis of the City's original complaint is to get Triton to repay the $496,265.09. But the court does have the power to order the repayment of money."

{¶77} Triton also claims that the city filed the fraud claim to punish it and to pressure it into settling its claims against the city for a lower amount. Triton presented no evidence to support these allegations, other than Samarghandi's deposition testimony in which he stated that he believed that the city had filed the fraud claim to exert pressure on him. That belief is insufficient to create a genuine issue of material fact. *See Schlaegel v. Howell,* 2015-Ohio-4296, 42 N.E.3d 771, ¶ 23 (2d Dist.); *White v. Sears, Roebuck & Co.,* 10th Dist. Franklin No. 10AP-294, 2011-Ohio-204, ¶ 8-9.

{¶78} Though the trial court's use of the phrase "clear evidence" was unfortunate, the record contains no evidence to support Triton's contention that the proceeding was perverted to attempt to accomplish an improper purpose for which it was not designed. Therefore, the trial court did not err in granting summary judgment in favor of the city on Triton's claim for abuse of process. We overrule its seventh assignment of error.

### *Frivolous Conduct*

{¶79} In its sixth assignment of error, Triton contends that the trial court erred in granting the city's motion for summary judgment on its claim for frivolous conduct under R.C. 2323.51, and in precluding it from raising the issue until after trial. It argues that Ohio law allows a party to raise a frivolous-conduct claim either by motion or counterclaim, and that the trial court erred in finding that it could only be pursued by motion.

{¶80} The record shows that the trial court allowed the city to amend its complaint to add a claim for fraud, based on Triton's failure despite repeated requests to return the mistaken payment. Triton then asserted counterclaims for abuse of process and for frivolous conduct. In its counterclaim, Triton alleged that

> the City's fraud claims were initiated and other actions were taken merely for the purpose of harassing or maliciously injuring Triton and Mr. Samarghandi, or for another improper purpose; and/or, upon information and belief, the City's fraud claims consist of allegations or other factual contentions that have no evidentiary support or are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

The city withdrew its fraud claim as part of a settlement of some issues immediately before trial.

{¶81} R.C. 2323.51(B)(1) provides that "at any time not more than thirty days after the entry of final judgment in a civil action or appeal, any party adversely affected by frivolous conduct may file a motion for an award of attorney costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal."

26

{¶82}  A split of authority exists as to the proper procedure to raise a claim of frivolous conduct.  Some courts have held that a request for sanctions under R.C. 2323.51 must be made by motion after the trial and some have held that it may be made by counterclaim as well as by motion.  *See Scheel v. Rock Ohio Caesars Cleveland, LLC*, 8th Dist. Cuyahoga No. 105037, 2017-Ohio-7174, ¶ 16; *Craine v. ABM Serv., Inc.*, 11th Dist. Portage No. 2011-P-0028, 2011-Ohio-5710, ¶ 10; *Shaver v. Wolske & Blue*, 138 Ohio App.3d 653, 673, 742 N.E.2d 164 (10th Dist.2000).

{¶83}  The trial court held that a claim for frivolous conduct must be raised by motion rather than in a counterclaim.  Nevertheless, Triton was not foreclosed from relief.  The court stated:

However, until the Supreme Court resolves the conflicting case law the Court finds that the claim is not entirely waived under Ohio law. Therefore, to the extent that the City's motion wishes this Court to find as matter of law that the claim is forever extinguished, the City's motion is denied.  The Court does find that the claim is premature and should be completely separated from the upcoming jury trial * * *.  The Court finds that if Triton would like to pursue this claim it should be restyled as a motion and filed after trial.

{¶84}  Triton never filed that motion.  The final judgment entry stated that in accordance with the court's previous entry, "judgment is entered in the City's favor and against Triton dismissing without prejudice Triton's counterclaim of frivolous conduct."  Since we have remanded the matter for a new trial, Triton is not foreclosed from raising the issue again in the trial court.  We need not issue an advisory opinion on this issue.  Therefore, we find the issue to be moot, and we decline to address it.  *See Schwab v. Lattimore*, 166 Ohio App.3d 12, 2006-Ohio-

1372, 848 N.E.2d 912, ¶ 10 (1st Dist.); *In re Bailey*, 1st Dist. Hamilton Nos. C-040014 and C-040479, 2005-Ohio-3039, ¶ 9.

{¶85}  In sum, we sustain Triton's first, second, third and eighth assignments of error and we remand the cause to the trial court for a new trial on Triton's differing-site-conditions claim.  We find Triton's sixth assignment of error to be moot, and we decline to address it.  Finally, we overrule Triton's remaining assignments of error, and we affirm the trial court's judgment in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**MYERS, P.J.,** and **CROUSE, J.**, concur.

Please note:
The court has recorded its own entry this date.