[Cite as *Vogel v. Albi*, 2020-Ohio-5242.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| JOE VOGEL, | : | APPEAL NO. C-190746 |
|  |  | TRIAL NO. A-1806867 |
| Plaintiff-Appellant/Cross-Appellee, | : |  |
|  |  | *O P I N I O N.* |
|  | : |  |
| vs. | : |  |
|  |  |  |
| FRANK J. ALBI, | : |  |
|  |  |  |
| and | : |  |
|  |  |  |
| THIRD STREET ASSOCIATES, LLC, | : |  |
|  |  |  |
| Defendants-Appellees/Cross-Appellants. | : |  |

Civil Appeal From:   Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: November 10, 2020

*Holzapfel Law, LLC,* and *Eric C. Holzapfel*, for Plaintiff-Appellant/Cross-Appellee,

*Eberly McMahon Copetas, LLC,* and *Robert A. McMahon*, for Defendants-Appellees/Cross-Appellants.

**MYERS, Presiding Judge.**

{¶1}   In this appeal, we are asked to determine whether a series of emails formed a binding contract between plaintiff-appellant/cross-appellee Joe Vogel and defendants-appellees/cross-appellants Frank Albi and Third Street Associates, LLC, ("Third Street") for the sale of a piece of real estate.

{¶2}   Because the emails failed to demonstrate a meeting of the minds between the parties, and because any acceptance of an offer by seller was contingent upon execution of a written contract, we hold that the trial court did not err in granting judgment in favor of Albi and Third Street on Vogel's claim for breach of contract. We further find that the trial court did not err in granting judgment in favor of Vogel on the counterclaims asserted by Albi and Third Street for tortious interference with a contract and business relationship, slander of title, abuse of process, and frivolous conduct, and we affirm the trial court's judgment in its entirety.

### Factual and Procedural Background

{¶3}   Third Street owns the property located at 318 West Third Street in downtown Cincinnati. Albi is the manager of Third Street, which is owned by the Albi Family Trust. Albi hired Joe Janszen, a local real estate agent, to sell 318 West Third Street. Janszen was unable to sell the building, and Albi engaged Williams and Williams, an auction company located in Tulsa, Oklahoma, to sell the property at auction. The property failed to sell at an auction held in November of 2018.

{¶4}   On December 3, 2018, Vogel emailed Williams and Williams to inquire about the property. Vicky Blackmon responded to Vogel on behalf of Williams and Williams, informing him that the property had not sold at auction and asking him if

he wanted to make an offer.  Vogel and Blackmon proceeded to exchange the following emails:

- Vogel to Blackmon (December 3, 2018, at 4:49 p.m.):  It didn't get a bid over $500K?

- Blackmon to Vogel (December 3, 2018, at 5:55 p.m.)[1]:  No it did not.  Would you like to make an offer over 500K?

- Vogel to Blackmon (December 4, 2018, at 8:37 a.m.):  I don't have to contact the bank of my wife and can have you the money in 24 hours.  $400,000[.]

- Blackmon to Vogel (December 4, 2018, at 12:47 p.m.):  Will you be paying cash for the property?  Will you be able to close in 30 days?  Once I have this information I will present your offer and see if the seller will entertain the offer.

- Vogel to Blackmon (December 4, 2018, at 12:57 p.m.):  Cash, close in 30 day[s].  I sent it to my lawyer, if nothing is wrong per him, it's a done deal[.]

- Blackmon to Vogel (December 4, 2018, at 1:58 p.m.):  I will present your offer to the seller to see if this is something that he will entertain and get back to you.  Below is a link to our website that has a copy of the contract, Disclosures, Terms of Sale.

- Vogel to Blackmon (December 4, 2018, at 5:30 p.m.):  ok, let me know.

- Blackmon to Vogel (December 5, 2018, at 7:49 a.m.):  The seller is considering your offer of $400,000.00 and will let me know

---

[1] Because Blackmon was located in Tulsa, Oklahoma, the time stamp on her emails reflects the Central Daylight Time Zone.

3

something by Friday. Please make arrangements to be prepared to sign the contract on Friday and wire down payment funds that day. The down payment will be $42,000.00 and I will provide wire instructions and a contract via email/docusign as soon as I hear from the seller. Please note that you will be responsible for the closing costs as listed in the contract. 400,000.00 Purchase Price[,] 20,000.00 Buyer's Premium[,] 420,000.00 Total Purchase Price[,] 42,000.00 Down payment. Let me know if you have any questions.

- Vogel to Blackmon (December 5, 2018, at 8:40 a.m.): ok, let me know.

- Blackmon to Vogel (December 5, 2018, at 8:52 a.m.): Will do[.]

- Blackmon to Vogel (December 6, 2018, at 3:03 p.m.): Below is the link to the Website as well as a link to the due diligence. I have also attached a copy of the title work for your convenience. Let me know if you have any questions. This should be everything your attorney needs to review the property.

- Blackmon to Vogel (December 7, 2018, at 9:40 a.m.): Good morning and Happy Friday! The seller has accepted your offer of 400K on the property. I will talk to you on Monday after you speak to your attorney. Please confirm that you received my email yesterday with the due diligence documents, link to the website and title commitment.

{¶5} At the bottom of each email from Blackmon below her signature was the following language, contained within a bold, black, box, as depicted below:

4

> Any written or verbal acceptance of an offer amount as relayed by Seller's agent is contingent upon receipt by Seller's agent of the required written contract and any Seller required addenda, fully executed by both Buyer and Seller.

{¶6} Following the unsuccessful auction, and during the same time period that Blackmon engaged in discussions with Vogel, Janszen also continued to look for a buyer for the property. One potential buyer that Janszen engaged in discussions with was the Loring Group, via its representative Ryan Dean. On December 6, 2018, Dean submitted an offer on the property, but Third Street rejected that offer because it included an inspection contingency and he did not want to accept an offer that contained a contingency.

{¶7} On December 7, 2018, Dean submitted a revised offer that did not include any contingencies. This offer was received subsequent to the email sent from Blackmon to Vogel conveying that the seller accepted his offer. After the offer from Dean was received, Janszen called Blackmon and asked her if the offer was received too late. Blackmon indicated that Vogel wanted to inspect the property. She suggested that Janszen wait to present Dean's offer to Albi until after Vogel had inspected the property and they knew if he was still interested in purchasing. Janszen was not in agreement with Blackmon's recommendation. A conference call was held between Albi, Blackmon, and Janszen on the afternoon of December 7. After that conference call, Albi emailed Blackmon at 4:45 p.m. and instructed her to tell Dean and the Loring Group that he was willing to accept the contingency-free offer.

{¶8} Blackmon then sent an email to Vogel on December 7, 2018, at 5:37 p.m. This email stated:

While I confirmed verbally that the seller would accept your offer of 400,000.00 as previously email[ed] to you below: 400,000.00 Purchase Price[,] 20,000.00 Buyer's Premium[,] 420,000.00 Total Purchase Price[,] 42,000.00 Down payment. You and I both know that it is not done until I receive a written contract and funds from you that I can present to my seller to execute. I have had an additional verbal offer today and provided a contract to them. I would urge you to complete the contract with your highest and best as soon as possible. I will provide wire instructions in a separate email. Let me know if you have any questions.

{¶9} Vogel responded that his attorney had been in court all day and would "work on this tomorrow." Blackmon attempted to follow up with Vogel on his attorney's review of the contract over the course of several days. The following emails were exchanged between Blackmon and Vogel:

- Blackmon to Vogel (December 11, 2018, at 1:59 p.m.): Has your attorney reviewed the contract?

- Vogel to Blackmon (December 11, 2018, at 3:34 p.m.): I don't know? Have you talked to him?

- Blackmon to Vogel (December 11, 2018, at 3:37 p.m.): Please reach out to your attorney and let me know if you are interested in signing the contract and wiring funds[.]

- Vogel to Blackmon (December 11, 2018, at 5:21 p.m.): What is the total income on the billboard. It looks like the lease is #81774 but the accounting of the billboard revenue is on an I-75 at W. Hills Viaduct Lease #81678?

{¶10} On December 12, 2018, Vogel's attorney, Eric Holzapfel, reached out to Blackmon via email. Holzapfel wrote that "I represent Joe Vogel, who is interested

6

in purchasing the above referenced property subject to an inspection. Who do I contact to obtain access to the building so that our inspector can look at it?"

{¶11} At about the same time, Dean submitted a signed contract and the purchase amount of his offer. On December 17, 2018, Blackmon emailed Holzapfel and informed him that "I received your message on Friday that you would like to have an inspector visit the site on Tuesday of this week. The seller has signed another offer on this property. Thank you for your time." Holzapfel responded to Blackmon via email the following day, stating that the seller had contracted to sell the property to Vogel, and that any attempt to sell the property to another party would be met with a lawsuit. Vogel also emailed Blackmon, stating in relevant part that "I know we never signed the contract but I told you that as long as the title work and the inspection was o.k. then we would do the deal (i.e. a verbal commitment)."

{¶12} After Albi, on behalf of Third Street, signed the contract submitted by Dean, Vogel filed a complaint against Albi and Third Street. The complaint asserted a claim for breach of contract and sought injunctive relief. It specifically requested that Albi and Third Street be enjoined from selling the property to anyone but Vogel and be ordered to specifically perform the contract that he claimed had been entered into with Vogel. Vogel additionally filed a motion for a temporary restraining order to prevent Albi and Third Street from selling the property.

{¶13} Along with their answer to the complaint, Albi and Third Street filed counterclaims against Vogel for quiet title, tortious interference with a contract and business relationship, slander of title, abuse of process, and frivolous conduct in filing civil claims.

{¶14} The trial court granted the motion for a temporary restraining order. The preliminary-injunction hearing was consolidated with a bench trial on the merits of the case.

{¶15} Blackmon testified at trial regarding her email exchange with Vogel. She explained that her December 7, 2018 email stating that the seller would accept Vogel's offer did not result in a completed deal between the parties because there could not be a "done deal" until she received the signed contract she previously sent, along with the funds. Blackmon testified that only Albi, as a representative of Third Street, had authority to accept a written offer. Blackmon also discussed her multiple attempts to follow up with Vogel after sending the December 7, 2018 email to see if he intended to submit the required contract and funds. She acknowledged that Vogel's initial offer made no mention of an inspection or any other contingency.

{¶16} Vogel testified that his offer to purchase the property included a purchase price of $400,000, in cash, with a closing date in 30 days, subject to approval by his lawyer. He stated that his offer did not include an inspection contingency, a $20,000 buyer's premium, or a down payment. Vogel testified that he believed a valid contract had been formed when he received Blackmon's email stating that the seller had accepted his offer. He acknowledged that he had seen the language at the bottom of each of Blackmon's emails referencing the execution of a written contract, but testified that "I never read it. I read it after my attorney got in contact with their attorney and said, hey, this is our legal way out, and that's when I read it, but I never read it prior. * * * I never read those things, but maybe I'm wrong."

{¶17} Albi testified that he had hired Williams and Williams to find a buyer for the property and to engage in negotiations, but that only he had authority to sign a contract. Albi acknowledged that Vogel's offer did not contain an inspection contingency, but explained that Vogel and his attorney later indicated that he wanted an inspection after being told that Albi would accept his offer. This changed the offer that Albi had initially agreed to, as he refused to accept any offers containing

8

contingencies. Albi testified that, in his opinion, a contract was never formed with Vogel because Vogel never submitted the required contract or down payment.

{¶18} Following the bench trial, the trial court found in favor of Albi and Third Street on Vogel's claim for breach of contract. It additionally found in favor of Albi and Third Street on their counterclaim for quiet title, but found in favor of Vogel on all remaining counterclaims.

{¶19} Vogel and Albi and Third Street appeal the trial court's ruling.

### *Vogel's Appeal*

{¶20} In two assignments of error, Vogel challenges the trial court's finding that there was no binding contract between the parties. We address these assignments together.

{¶21} The existence of a contract is a question of law that we review de novo. *North Side Bank & Trust Co. v. Trinity Aviation, LLC*, 1st Dist. Hamilton Nos. C-190021 and C-190023, 2020-Ohio-1470, ¶ 17. For a contract to exist, there must be a meeting of the minds between the parties, as evidenced by an offer, acceptance, and consideration. *Id.* at ¶ 15. The essential terms of the agreement must also be reflected in the contract with definiteness and certainty. *Id.* Typically, the essential terms of a contract "include the subject matter, identity of the parties bound, consideration, price, and quantity." *Id.*

{¶22} Because the alleged contract in this case was one for a sale of lands, it was required to be in writing to comply with the statute of frauds. R.C. 1335.05; *Mezher v. Schrand*, 1st Dist. Hamilton No. C-180071, 2018-Ohio-3787, ¶ 8. A writing is in compliance with the statute of frauds where it "(1) identifies the subject matter, (2) establishes that a contract has been made, and (3) states the essential terms with reasonable certainty." *Mezher* at ¶ 8.

{¶23} A written contract can be established through an email or a series of emails construed together. *See id.* at ¶ 10; *North Side Bank & Trust* at ¶ 18. In determining whether a contract was formed by an exchange of emails, we must evaluate the emails to "ascertain whether they 'connote[ ] an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound.' " *North Side Bank & Trust* at ¶ 18, quoting *Cuyahoga Cty. Hosp. v. Price*, 64 Ohio App.3d 410, 415, 581 N.E.2d 1125 (8th Dist.1989).

{¶24} Following our review of the record, we find that the emails did not form a binding contract because the record clearly demonstrates that the parties contemplated the execution of a formal contract and did not intend to be bound by the email exchange.

{¶25} As this court explained in *Mezher*:

An agreement can be specifically enforced even where the parties contemplated execution of a formal written document, so long as the parties have manifested an intent to be bound and their intentions are sufficiently definite. *Normandy Place Assoc. v. Beyer*, 2 Ohio St.3d 102, 105-106, 443 N.E.2d 161 (1982). In determining whether the parties intended to be bound, courts can look at the circumstances surrounding the parties' discussion. *26901 Cannon Rd. LLC v. PSC Metals, Inc.*, 8th Dist. Cuyahoga No. 80986, 2002-Ohio-6050, ¶ 17. Moreover, the question of whether the parties intended a contract is a factual question for the finder of fact. *Normandy Place* at 105, citing *Arnold Palmer Golf Co. v. Fuqua Indus., Inc.*, 541 F.2d 584, 588 (6th Cir.1976) (applying Ohio law).

*Mezher* at ¶ 11.

{¶26} Here, the trial court specifically found that "the parties['] intent to be bound was not present until the required contract form was initiated."

{¶27} Every email sent from Blackmon to Vogel contained the following clause, located inside a black box as depicted below, at the end of the email following the signature line:

> Any written or verbal acceptance of an offer amount as relayed by Seller's agent is contingent upon receipt by Seller's agent of the required written contract and any Seller required addenda, fully executed by both Buyer and Seller.

Vogel acknowledged that the emails contained this language.

{¶28} Before emailing Vogel to let him know that the seller had accepted his offer, Blackmon sent Vogel two separate emails referencing the execution of a formal contract. She first emailed him on December 4, 2018, to let him know that she would present his offer to the seller, and she included in that email a copy of the required written contract for Vogel to review. Blackmon then emailed Vogel on December 5, 2018, to let him know that, should the offer be accepted, he needed to be prepared to sign a contract that same day. Vogel received notice on December 7, 2018, that his offer had been accepted, and later that same day received an email from Blackmon stating that the deal would not be completed until she received a written contract and funds to present to the seller. Vogel sent neither. On December 11, 2018, Blackmon emailed Vogel to inquire about the execution of the written contract, which had not yet been submitted, stating "Please reach out to your attorney and let me know if you are interested in signing the contract and wiring funds[.]"

{¶29} The record clearly supports the trial court's factual finding that the parties' did not intend to be bound by the emails and contemplated the execution of a formal, written contract.

{¶30} We further find that the emails failed to demonstrate that the parties had reached a "meeting of the minds." As set forth in his email to Blackmon on

December 4, 2018, Vogel offered to purchase the property for $400,000 cash, with a closing date in 30 days, subject to approval by his lawyer. The following day, Blackmon informed Vogel that the seller was considering his offer, and that, should the offer be accepted, Vogel would be responsible for closing costs set forth in the contract and for a buyer's premium of $20,000, resulting in a total purchase price of $420,000. Vogel responded with an email stating "ok, let me know." This email from Blackmon to Vogel informing him of the buyer's premium was essentially a counter offer. And Vogel's response was not a definitive acceptance of that counter offer or acquiescence to a $420,000 purchase price. We cannot find that the emails reflect with definiteness and certainty the purchase price agreed upon by the parties. *See North Side Bank & Trust,* 1st Dist. Hamilton Nos. C-190021 and C-190023, 2020-Ohio-1470, at ¶ 15; *Mezher* at ¶ 8.

{¶31} The record further indicates that the parties contemplated an additional term that was not set forth in the email exchange, specifically an inspection of the property. Vogel's email on December 4, 2018, offering a $400,000 purchase price, did not mention an inspection. But after Blackmon emailed Vogel on December 7, 2018, to inform him that his offer had been accepted, she sent an email to Albi and Janszen stating that "The buyer also wants to schedule an inspection on the property. I will get back to you with a date and time." While the record is silent as to how or when the subject of an inspection was first raised, it is apparent that, despite his testimony at trial to the contrary, Vogel did want to inspect the property before purchasing. The record supports a reasonable inference that Vogel mentioned the inspection in a phone call to Blackmon after he received her acceptance email. Further supporting the fact that Vogel wanted an inspection is his attorney's email to Blackmon stating that Vogel was interested in purchasing the property "subject to an inspection." And after being informed that the seller had accepted a different offer,

12

Vogel sent Blackmon an email stating that he would have followed through with the deal "as long as the title work and the inspection was o.k."

{¶32} Because the series of emails containing the terms of the contract made no mention of an inspection and did not definitively establish a purchase price, we cannot find that the parties had reached a meeting of the minds. *See North Side Bank & Trust* at ¶ 15.

{¶33} We therefore hold that, because any agreement reached between the parties was contingent upon the execution of a written contract, and because the emails failed to demonstrate a meeting of the minds, the trial court did not err in finding that there was no binding contract between the parties and in granting judgment to Albi and Third Street on Vogel's claim for breach of contract.

{¶34} Vogel's first and second assignments of error are overruled.

### *Cross-Appeal*

{¶35} In a single assignment of error, Albi and Third Street argue that the trial court's finding in favor of Vogel on their counterclaims for tortious interference with a contract and business relationship, slander of title, abuse of process, and frivolous conduct in filing civil claims was against the manifest weight of the evidence.

{¶36} When reviewing the manifest weight of the evidence of a trial court's judgment in a civil case, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *Battle Axe Constr., L.L.C. v. H. Hafner & Sons, Inc.*, 1st Dist. Hamilton No. C-180640, 2019-Ohio-4191, ¶ 11, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-

2179, 972 N.E.2d 517, ¶ 20. We must make all reasonable presumptions in favor of the trial court's finding of facts and judgment. *Id.* at ¶ 12. "If the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment." *Id.*, quoting *Karches v. City of Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988).

### 1. *Tortious Interference With Contract and Business Relationship*

{¶37} To prove tortious interference with a business relationship, a plaintiff must establish "that the defendant intentionally and improperly interfered with the plaintiff's prospective business relations by either (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing the plaintiff from acquiring or continuing the prospective relation." *Alexander v. Motorists Mut. Ins. Co.*, 1st Dist. Hamilton No. C-110836, 2012-Ohio-3911, ¶ 30. A plaintiff is not required to establish that the defendant acted with malice, but bears the burden of showing that the interference lacked justification or privilege. *Id.* at ¶ 30-31.

{¶38} To prove tortious interference with contract, a plaintiff must establish "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *See id.* at ¶ 33. As with the tort of tortious interference with a business relationship, the plaintiff bears the burden of establishing a lack of justification or privilege. *Id.* "[O]ne is privileged to purposely cause another not to perform a contract with a third person where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract." *Smith v. Natl. Western Life*, 2017-

Ohio-4184, 92 N.E.3d 169, ¶ 21 (8th Dist.), quoting *Pearse v. McDonald's Sys. of Ohio, Inc.*, 47 Ohio App.2d 20, 25, 351 N.E.2d 788 (10th Dist.1975).

{¶39} Albi and Third Street contend that the evidence presented at trial established that Vogel, with knowledge that he had not signed his own contract to purchase the property or tendered the required down payment, committed tortious interference with their contract or business relationship with Dean by creating a title problem to the property that could not be remedied, resulting in termination of that contract.

{¶40} Vogel testified that he believed a valid contract with Albi and Third Street had been formed when he received Blackmon's email on December 7, 2018, stating that the seller had accepted his offer. Interpreting this testimony and reasonable presumptions in favor of the trial court's judgment, *see Battle Axe Constr. L.L.C.*, 1st Dist. Hamilton No. C-180640, 2019-Ohio-4191, at ¶ 12, we find that the evidence could reasonably have established that Vogel's actions were privileged and were taken to protect his own business interests, which he believed would be impaired by performance of the seller's contract with Dean. *See Smith* at ¶ 21.

{¶41} Because Albi and Third Street failed to meet their burden to prove that Vogel acted without privilege, we find that the trial court's judgment in favor of Vogel on the counterclaim for tortious interference with a contract or business relationship was not against the manifest weight of the evidence.

### 2. Slander of Title

{¶42} To prove the tort of slander of title, a claimant must establish that "(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages."

*Whitman v. Gerson*, 1st Dist. Hamilton Nos. C-140592 and C-140595, 2016-Ohio-311, ¶ 27, quoting *Green v. Lemarr,* 139 Ohio App.3d 414, 430-431, 744 N.E.2d 212 (2d Dist.2000).

{¶43} Albi and Third Street argue that the evidence established that Vogel committed slander of title when his attorney, with knowledge that Vogel did not have a valid contract on the property, asserted in an email dated December 18, 2018, that Vogel had a valid contract to purchase the property and threatened to file suit if the property was sold to another buyer.

{¶44} Construing the evidence presented at trial in a manner consistent with the trial court's judgment, we find that Albi and Third Street failed to establish that Vogel acted with the requisite malice or reckless disregard for a statement's falsity that is necessary to prove slander of title. *See Battle Axe Constr. L.L.C.*, 1st Dist. Hamilton No. C-180640, 2019-Ohio-4191, at ¶ 12. Vogel testified that he believed a valid contract with Albi and Third Street had been formed when he received Blackmon's email on December 7, 2018, stating that the seller had accepted his offer. If the trial court found this testimony credible, it could reasonably have found that Vogel acted to protect his own business interest, and not with malice or with reckless disregard for the falsity of the statement that the property could not be sold to another buyer because Vogel had a contract to purchase it.

{¶45} The trial court's judgment in favor of Vogel on the counterclaim for slander of title was not against the manifest weight of the evidence.

### 3. *Abuse of Process*

{¶46} To establish abuse of process, a plaintiff must prove "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for

16

which it was not designed; and (3) that direct damage has resulted from that wrongful use of process." *City of Cincinnati v. Triton Servs., Inc.*, 2019-Ohio-3108, 140 N.E.3d 1249, ¶ 75 (1st Dist.).

{¶47} Albi and Third Street argue that the evidence presented at trial established that Vogel, with knowledge that he did not have a valid contract, used the lawsuit to force Third Street to sell him the property.

{¶48} Following our review of the record, we cannot find that the trial court's ruling in favor of Vogel on this counterclaim was against the manifest weight of the evidence. If the trial court found credible Vogel's testimony that he believed a valid contract had been formed when he received Blackmon's email on December 7, 2018, stating that the seller had accepted his offer, it could reasonably have found that Vogel initiated the lawsuit to protect what he believed to be his own legal interests and not to accomplish an ulterior purpose. *See Battle Axe Constr. L.L.C.*, 1st Dist. Hamilton No. C-180640, 2019-Ohio-4191, at ¶ 12.

### R.C. 2323.51

{¶49} Albi and Third Street last challenge the trial court's finding in favor of Vogel on their counterclaim for frivolous conduct in filing civil claims pursuant to R.C. 2323.51. They contend that Vogel committed frivolous conduct under R.C. 2323.51(A)(2) by, among other things, using the lawsuit to harass them, asserting claims that were not warranted under existing law, and by making multiple allegations of fact that had no evidentiary support.

{¶50} R.C. 2323.51(B)(1) provides in relevant part that "at any time not more than thirty days after the entry of final judgment in a civil action or appeal, any party adversely affected by frivolous conduct may file a motion for an award of court costs,

17

reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal."

{¶51} As this court recognized in *Triton*, "[a] split of authority exists as to the proper procedure to raise a claim of frivolous conduct. Some courts have held that a request for sanctions under R.C. 2323.51 must be made by motion after the trial and some have held that it may be made by counterclaim as well as by motion." *Triton*, 2019-Ohio-3108, 140 N.E.3d 1249, at ¶ 82. The *Triton* court ultimately concluded that the issue was moot because it had remanded the matter on other grounds and Triton was not foreclosed from raising the issue again in the trial court. *Id.* at ¶ 84. We resolve the issue now.

{¶52} R.C. 2323.51(B)(1) is not ambiguous. It clearly states that within 30 days of the entry of a final judgment, a party adversely affected by frivolous conduct "may file a *motion* for an award of court costs, reasonable attorney's fees, and other reasonable expenses." (Emphasis added.) R.C. 2323.51(B)(1). "[W]here the terms of a statute are clear and unambiguous, the statute should be applied without interpretation." *Wilson v. Lawrence*, 150 Ohio St.3d 368, 2017-Ohio-1410, 81 N.E.3d 1242, ¶ 11, quoting *Wingate v. Hordge,* 60 Ohio St.2d 55, 58, 396 N.E.2d 770 (1979). In other words, an unambiguous statute is to be applied, not interpreted. *Id.* "When the statutory language is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the General Assembly has said." *Id.*, quoting *Jones v. Action Coupling & Equip., Inc.,* 98 Ohio St.3d 330, 2003-Ohio-1099, 784 N.E.2d 1172, ¶ 12.

{¶53} R.C. 2323.51(B)(1) clearly and unequivocally provides that a request for costs and fees based on frivolous conduct should be made by motion. If the General Assembly had intended for such an issue to be raised in a counterclaim, it could have so provided. We accordingly hold that a motion for fees and costs under R.C. 2323.51(B)(1) based on another party's frivolous conduct must be raised by

motion. *See Wochna v. Mancino*, 9th Dist. Medina No. 07CA0059-M, 2008-Ohio-996, ¶ 29 ("R.C. 2323.51 does not create a separate cause of action for frivolous conduct"); *Shaver v. Wolske & Blue*, 138 Ohio App.3d 653, 673, 752 N.E.2d 164 (10th Dist.2000); *Scrap Yard, LLC v. Cleveland*, 513 Fed.Appx. 500, 506 (6th Cir.2013) fn. 1; *contra Texler v. Papesch*, 9th Dist. Summit No. 18977, 1998 WL 597870, *2 (Sept. 2, 1998) ("Although the statute does not specify whether a party can make a claim for attorney's fees in the form of a counterclaim, the case law makes clear that it is an accepted method"); *Scheel v. Rock Ohio Caesars Cleveland, LLC*, 8th Dist. Cuyahoga No. 105037, 2017-Ohio-7174, ¶ 16.

**{¶54}** Because a request for fees and costs based on frivolous conduct pursuant to R.C. 2323.51(B)(1) cannot be raised in a counterclaim, we hold that the trial court did not err in granting judgment to Vogel, and we overrule Albi and Third Street's assignment of error.

### *Conclusion*

**{¶55}** Having overruled all assignments of error raised in the appeal and cross-appeal, we accordingly affirm the trial court's judgment to Albi and Third Street on the claim for breach of contract and their counterclaim for quiet title, as well as its judgment in favor of Vogel on all remaining counterclaims.

Judgment affirmed.

**BERGERON** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.