[Cite as *Couzens v. Union Bank & Trust Co.*, 2024-Ohio-306.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| BISHOP VICTOR S. COUZENS, | : | APPEAL NO.   C-230130 |
| | | TRIAL NO.    A-2003661 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| UNION BANK AND TRUST CO., | : | |
| | | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: January 31, 2024

*Mezibov Butler* and *Marc D. Mezibov*, for Plaintiff-Appellant,

*DeBlasis Law Firm, LLC,* and *Rick D. DeBlasis*, for Defendant-Appellee.

**CROUSE, Presiding Judge.**

**{¶1}** This case concerns plaintiff-appellant Bishop Victor S. Couzens's allegations that Union Bank and Trust Co. ("Union Bank") improperly encouraged members of the Inspirational Bible Church ("IBC") to terminate Couzens's employment contract as IBC's senior pastor in order to continue doing business with Union Bank. This appeal concerns the trial court's grant of summary judgment in favor of Union Bank. For the reasons that follow, we affirm the judgment of the trial court.

## I. Procedural History

**{¶2}** In his amended complaint, Couzens claimed that Union Bank is liable for tortious interference with contractual relations, tortious interference with business relations, defamation per se and per quod, false-light invasion of privacy, and civil conspiracy. While litigating motions in the trial court, Couzens abandoned his claims for false-light invasion of privacy and defamation.

**{¶3}** Union Bank filed a motion for summary judgment on the remaining claims. Following briefing from the parties, supported by exhibits and depositions, the trial court granted summary judgment in favor of Union Bank. This appeal timely followed.

## II. Factual History

**{¶4}** In January 2015, IBC signed a loan agreement with Union Bank for $5.1 million in funding in exchange for a mortgage on the church's property, alleged in this action to be worth approximately $15 million. The loan was to last five years, with monthly payments of approximately $33,000 during the life of the loan and a balloon payment of the remaining amount due upon maturity in January 2020. In May 2017, IBC and Union Bank entered into a loan-modification agreement, reducing the

monthly payments to around $27,000, but leaving the other terms of the loan in place.

{¶5}   From 2016 through 2020, church membership and revenue dropped precipitously. Membership had dropped from a peak of as many as 2,000 to between 180 to 200 congregants. Annual revenue dropped from $1.6 million in 2016 to $500,000 in 2020. Union Bank alleges that this drop in revenue is directly attributable to negative publicity regarding Couzens. The record also reveals that Couzens took out additional loans in the church's name and that the repayment of those additional loans caused IBC to miss payments owed to Union Bank in 2019.

{¶6}   In August 2019, IBC and Union Bank entered into a "Forbearance Agreement." In the agreement, IBC acknowledged that it was in default on its loan from Union Bank. Union Bank agreed that, in exchange for forbearing to file for foreclosure against IBC, IBC would list the church's property for sale, make interest-only payments for the remainder of the loan term, and would deliver certain financial information to Union Bank.

{¶7}   In September 2019, Couzens hired Bishop Z.T. Davis to serve as "executive pastor" and oversee IBC's finances, including negotiations with Union Bank. Couzens was not involved in the negotiations as he left Cincinnati for a sabbatical in Florida.

{¶8}   In November or December 2019, Davis presented a plan to Union Bank for repaying the loan. Union Bank neither rejected nor accepted the offer. Instead, Charity Kuehn, Union Bank's Vice President for Church Lending and primary contact person for the loan, emailed IBC explaining that any further negotiations with IBC to restructure the loan would be contingent on the retirement, resignation, or removal of Couzens from any position at IBC.

{¶9} Couzens alleges, and Union Bank disputes, that at some point between the end of December 2019 and the beginning of January 2020, Kuehn visited Cincinnati to discuss options for repaying the loan. Couzens suggests that at the meeting, Kuehn pressured the members and leadership of IBC to remove Couzens.

{¶10} In early January 2020, a group of church members purporting to act for the church voted to remove Couzens as pastor. Couzens contends that the group did not have the authority to make such a decision. Couzens was informed that his purported termination would be effective on February 7, 2020. Members of the church contacted the Forest Park Police Department to request an off-duty security detail for the church services on February 9. When Couzens showed up to preach that morning, officers escorted him from the premises for trespassing.

### III. Analysis

{¶11} In his first assignment of error, Couzens argues that the trial court erred in granting summary judgment on his claims of tortious interference with his business and contractual relationship with IBC. In his second assignment of error, Couzens argues that the trial court erred in granting summary judgment on his civil-conspiracy claim.

### A. First Assignment of Error

{¶12} In his first assignment of error, Couzens argues that the trial court erred in granting summary judgment in favor of Union Bank because there were genuine issues of material fact that were inappropriate to resolve on summary judgment. Specifically, Couzens argues that a jury should have been permitted to decide the issues of causation, whether Couzens had an employment contract with IBC, whether Union Bank was aware of the contractual relationship between Couzens and IBC,

whether Union Bank intended IBC to breach its contract with Couzens, and whether Union Bank's interference was justified.

{¶13} This court reviews the trial court's decision on summary judgment de novo. *Hefler v. Remke Mkts., Inc.*, 1st Dist. Hamilton No. C-200364, 2021-Ohio-2694, ¶ 7. "Summary judgment is appropriate if 1.) no genuine issue of material fact exists for trial, 2.) the moving party is entitled to judgment as a matter of law, and 3.) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor." *Id.*, quoting *Wal-Mart Realty Co. v. Tri-County Commons Assocs., LLC*, 1st Dist. Hamilton No. C-160747, 2017-Ohio-9280, ¶ 8.

### 1. Tortious Interference with Contract

{¶14} "The elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Alexander v. Motorists Mut. Ins. Co.*, 1st Dist. Hamilton No. C-110836, 2012-Ohio-3911, ¶ 33, citing *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 416, 650 N.E.2d 863 (1995), paragraph two of the syllabus.

{¶15} Union Bank argues that it was justified in conditioning its future negotiations with IBC on Couzens's removal because it was protecting its own legitimate business interests. In a tortious-interference case, the plaintiff bears the burden of showing that the defendant lacked justification for the alleged interference. *Id.* at ¶ 33, citing *Andrews v. Carmody*, 145 Ohio App.3d 27, 33, 761 N.E.2d 1076 (11th Dist.2001). It is proper for the court to reject a tortious-interference claim "on the grounds that the defendant was privileged to protect its own business relationships or

that the plaintiff presented no evidence of the defendant's intent to interfere." *Id.* at ¶ 31, citing *Elwert v. Pilot Life Ins. Co.*, 77 Ohio App.3d 529, 537, 602 N.E.2d 1219 (1st Dist.1991).

{¶16} To determine whether the interference lacked justification, the Ohio Supreme Court has adopted Restatement of the Law 2d, Torts, Section 767 (1979). *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999), paragraph three of the syllabus. In making such a determination, the court should consider the following factors:

(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.*

{¶17} The trial court properly applied this framework to its analysis of Union Bank's claim of justification.

{¶18} There is no genuine issue of material fact regarding the nature of Union Bank's conduct. It is undisputed that Kuehn sent a pair of emails to IBC informing IBC that Union Bank would not move forward with any further loan modifications as long as Couzens was associated with IBC. While the parties dispute whether Kuehn personally visited Cincinnati before the vote to oust Couzens to encourage the membership to vote Couzens out, it is undisputed that Union Bank encouraged IBC to cut ties with Couzens in order to maintain its business relationship with the bank. Even

6

if we were to credit Couzens's version of events, Union Bank's conduct was the two emails and Kuehn's presentation of options for continuing the financial relationship with the bank.

{¶19} There was no genuine issue of material fact regarding the motive of Union Bank. The trial court found that the motivation of Union Bank was to protect its financial interests and there was no evidence that it intended either to harm Couzens or profit from Couzens's termination. Couzens has not presented any evidence of Union Bank's ulterior motive. Instead, Couzens made a sweeping allegation that "it was well known in the community of African American churches that banks did not like to lend to black churches." However, in this case, Union Bank had already lent more than $5 million to IBC. Union Bank had no problem lending to IBC in the first instance. Union Bank made efforts to protect its financial interests after IBC defaulted on its loan, defaulted again after the loan-modification agreement, and sought further modifications to its loan.

{¶20} It is undisputed that the interest with which Union Bank interfered was Couzens's employment with IBC. We agree that there was no genuine issue of material fact that Couzens had an employment interest that was subjected to interference at least partially due to the prompting of Union Bank.

{¶21} The interest Union Bank sought to advance was protecting its own business interest in keeping the loan to IBC active and recovering the loan amount. Union Bank argues that its actions were necessary because it believed that Couzens's continued relationship with IBC jeopardized IBC's ability to repay the loan. Couzens has not provided any evidence to the contrary. Rather, Couzens argues that the bank had less drastic means at its disposal, such as calling the loan pursuant to the default

provisions or filing a foreclosure action against the property. However, these arguments are unavailing: the loan was already set to mature with a balloon payment due imminently in January 2020, and IBC's negotiations with Union Bank were intended to prevent foreclosure. Further, IBC had already agreed with Union Bank in its prior loan-modification agreement to list the church for sale so that it could pay the loan balance without going through foreclosure.

{¶22} With regard to the factor of the social interests in protecting the freedom of action of the actor and the contractual interests of the other, the trial court found that "[t]here is a societal interest in permitting a bank to condition a loan should they so choose, but there is also an interest in permitting an individual to privately contract for employment. This factor is neutral and favors neither party." We agree with the trial court's assessment.

{¶23} There was no genuine issue of material fact regarding the proximity of Union Bank's conduct to the interference. Union Bank's conduct of sending the emails suggesting that Couzens be removed from his position at IBC immediately preceded the vote to remove him.

{¶24} Finally, it is undisputed that the relationship between the parties is the business relationship of lender and officer of the commercial borrower. This is an arms-length relationship.

{¶25} There are no genuine issues of material fact relevant to the issue of justification. We agree with the trial court that, when examining the *Fred Siegel* factors, Couzens has failed to adduce evidence sufficient to show that Union Bank was not justified in its conduct. Because Union Bank's conduct was justified, we need not consider the other elements of Couzens's claim of tortious interference with contract.

### 2. Tortious Interference with Business Relations

**{¶26}** "To prevail on a claim for tortious interference with a business relationship, the plaintiff must show that the defendant intentionally and *improperly interfered* with the plaintiff[']s prospective business relations by either (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing the plaintiff from acquiring or continuing the prospective relation." (Emphasis added.) *Alexander*, 1st Dist. Hamilton No. C-110836, 2012-Ohio-3911, at ¶ 30. Just as with the tortious-interference-with-contract claim, the plaintiff must show that the alleged interference was without justification to prevail on a tortious-interference-with-business-relations claim. *Id.* at ¶ 31.

**{¶27}** This court has not previously adopted a specific standard for justification as a defense to tortious interference with business relations. However, we previously recognized that the factors are similar to tortious interference with contract in *Clark v. Christ Hosp.*, 1st Dist. Hamilton No. C-060342, 2007-Ohio-4317, ¶ 20, citing *Fred Siegel*, 85 Ohio St.3d at 176, 707 N.E.2d 853. Additionally, the Restatement 2d of Torts applies the same defenses to both torts. *See* 4 Restatement of the Law 2d, Torts, Section 767, Comment a (1979). Therefore, we now hold that the same factors for evaluating justification enumerated in *Fred Siegel* apply to a claim for tortious interference with business relations.

**{¶28}** Because the same factors apply to both claims, our analysis above applies equally to Couzens's claim for tortious interference with business relations. Couzens has failed to show that Union Bank's conduct was not justified. Once again, we need not consider the other elements of Couzens's claim.

**{¶29}** Accordingly, Couzens's first assignment of error is overruled.

### *B. Second Assignment of Error*

**{¶30}** In his second assignment of error, Couzens argues that the trial court erred in granting summary judgment in favor of Union Bank on his claim of civil conspiracy. As in his first assignment of error, Couzens argues that there are genuine issues of material fact that should have been decided by a jury.

**{¶31}** Civil conspiracy is a derivative claim that "cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Meehan v. Mardis*, 2019-Ohio-4075, 146 N.E.3d 1266, ¶ 46 (1st Dist.). Because we have held that the trial court correctly granted summary judgment in favor of Union Bank on Couzens's tortious-interference claims, his civil-conspiracy claim must also fail.

**{¶32}** Couzens's second assignment of error is overruled.

### *IV. Conclusion*

**{¶33}** Couzens's assignments of error are overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

**ZAYAS** and **BERGERON, JJ.**, concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.